[No. 7812–1–II.   Division Two.   November 3, 1986.]

HIGHLINE COMMUNITY COLLEGE, *Appellant,* v. THE HIGHER EDUCATION PERSONNEL BOARD, ET AL, *Respondents.*

*Kenneth O. Eikenberry, Attorney General,* and *Rick D. Woods, Assistant,* for appellant.

*Kenneth O. Eikenberry, Attorney General,* and *Richard A. Heath, Senior Assistant,* for respondent Higher Education Personnel Board.

*Mark S. Lyon,* for respondents Washington Public Employees Association, et al.

WORSWICK, C.J.—We are again asked to decide whether the Higher Education Personnel Board properly determined that Highline Community College committed an unfair labor practice when it fired John Clayton. *See Washington Pub. Employees Ass'n v. Community College Dist. 9,* 31 Wn. App. 203, 642 P.2d 1248 (1982). We hold that it did not. We reverse superior court and board orders to the contrary.

The background and basic facts are set forth in our previous opinion. The following additional facts, none of which is seriously disputed, are useful to place this second round of the proceedings in context.

Clayton was chief accountant at Highline Community College. From 1974 on, his immediate supervisor was Terry Eade, Highline's controller. Eade, in turn, reported to Don Slaughter, Highline's business manager. Clayton had problems with his job as early as 1968. At that time, he was unable to balance the books. A certified public accountant was hired to assist him in that task from 1968 through 1970. When Eade began his job as controller in 1974, he noted problems with Clayton's work performance. Eade testified that as he became more familiar with the system and practices of the College, he became more aware of Clayton's poor performance. In June of 1975, Clayton made a $20,000 calculation error in a year–end statement.

In July of 1975, the Highline business office began using a new computer system. This system caused problems with

inaccurate and incomplete data. In December of 1975, Eade discovered that the general ledger, Clayton's responsibility, had been out of balance for several months. Highline brought in a trainer to help Clayton resolve this problem and improve his job performance.

In March of 1976, a union shop election was held at the College. The bargaining unit included 13 classified positions considered to be supervisory. Both Eade and Clayton were within the unit. Slaughter was not. Before the election, Slaughter distributed a memo to all classified employees, titled "The Union Shop—Have you thought it through?" The memo expressed no opinion on the union issue. It merely contained several rhetorical questions about the union shop.

As was their right, several classified employees expressed their personal views. Jane Sacks, Eade's secretary, circulated a petition against the union shop. She asked Clayton to sign it, but he refused. Other classified employees campaigned for the union shop. Following Sacks' petition, an attorney for the Washington Public Employees Association (WPEA) contacted Eade and berated him for allowing his secretary to campaign against the union shop. Eade, as was his right as a member of the bargaining unit, thereafter circulated a memo entitled "Grumpy Editorial Comment" in which he pointed out that all classified employees had the right to speak for or against the union shop.

During this period, while in the coffee room Eade asked Clayton his position on the union shop. Clayton told Eade, "I am for it." Eade said, "We'll see" and nodded his head. Clayton testified that this remark caused him to become apprehensive. The election was held on March 25, 1976. The union shop was adopted, and the WPEA was certified as the shop representative on April 5, 1976.

In April of 1976, Highline found that Clayton had failed to pay child care premiums for four quarters, which resulted in the lapse of coverage for students and a temporary denial of benefits to at least one child.

A few days prior to May 10, 1976, Eade met with Clayton

and discussed several concerns with Clayton's work performance. Clayton acknowledged the problems and indicated he could solve them. According to Clayton, Eade told him he had no confidence in his work. On May 10, Eade sent Clayton a memorandum requesting Clayton to prepare a 30–minute presentation on May 13 to Slaughter and Eade regarding the implementation of the computer system. Because of the earlier meeting with Eade, Clayton was apprehensive about the request and contacted his union representative. On May 12, Clayton submitted an affidavit to WPEA and to the Board in which he expressed fears about being harassed because of his union activity.

A WPEA attorney accompanied Clayton to the May 13 meeting. Slaughter expressed his displeasure at this, indicating that he felt it was unnecessary. Clayton gave an inadequate presentation and was unable to answer simple questions. He also provided inaccurate and incomplete information about the system.

Clayton then missed 6 weeks of work for health reasons. During his absence, a temporary employee was hired, but when Clayton returned there was a backlog. Thereafter, Clayton's work performance deteriorated; he committed many major accounting errors during 1976 and 1977. During this period, Eade and Clayton had several counseling sessions about the mistakes. In October 1976, as a last resort, Eade wrote a letter of admonishment. Follow–up meetings were held between Clayton and Eade, but Clayton's performance did not improve. Highline employed a part–time assistant for Clayton, but this did not help.

Late in 1976, Slaughter and Eade met with Clayton, and he admitted his poor work. The parties discussed a possible reorganization of the office to relieve Clayton of his supervisory duties. During the next few months, several reorganization plans were discussed. On July 11, 1977, a detailed plan was presented. Slaughter asked Clayton to confirm his willingness to accept a voluntary demotion effective August 1, 1977. On July 22, Clayton sent a memorandum to Slaughter stating he would not accept the demotion and

would seek a Higher Education Personnel Board hearing. On July 26, Clayton asked for a written outline of the alternatives available. Slaughter did not answer. Clayton was fired August 9, 1977. The proceedings, and the results thereof, described in our previous opinion followed.

Upon remand, the Board took no further testimony, but again reviewed the evidence presented in the first proceeding. It reached the same conclusion and entered findings, conclusions and an order accordingly. The matter then was brought before the Superior Court. This time, however, Highline purported to appeal under the administrative procedure act (APA). Clayton and the WPEA cross–petitioned for an enforcement order.

The court concluded that it was limited to determining only whether *any* substantial evidence in the record supported the Board's findings. Believing that there was such evidence, it affirmed the Board.

At the threshold, we are again required to consider, and this time to determine, the applicable standard of review. Highline contends that because this is a contested case and this time it appealed, we should apply the APA standard set forth in RCW 34.04.130, citing *Clallam Cy. v. Public Empl. Relations Comm'n,* 43 Wn. App. 589, 719 P.2d 140 (1986). We disagree.

■ This started as and continues to be an enforcement proceeding. The mandate of our previous opinion was clear:

> Accordingly, we decline enforcement of the Board's order *without prejudice to a renewed application for enforcement after the additional proceedings that we direct.* We remand the case to the Board *solely for a determination of the unfair labor practice in accordance with the standards announced in this opinion.*

(Italics ours.) *Washington Pub. Employees Ass'n,* 31 Wn. App. at 214. Highline cannot appeal now and thus change the standard of review. *See Adamson v. Traylor,* 66 Wn.2d 338, 402 P.2d 499 (1965). The standard of review in this case is that for enforcement proceedings announced in *Public Empl. Relations Comm'n v. Kennewick,* 99 Wn.2d

832, 664 P.2d 1240 (1983). The APA does not apply.

However, the trial court took too narrow a view of the evidence. It followed the classic substantial evidence test applied to review of trial court findings of fact. Under that test, the reviewing court is limited to determining only whether the evidence most favorable to the prevailing party supports the challenged finding. *See State v. Black,* 100 Wn.2d 793, 676 P.2d 963 (1984). This is not the applicable test.

■ *Public Empl. Relations Comm'n v. Kennewick* adopted the federal standard of review for findings of fact in unfair labor practice cases. *Public Empl. Relations Comm'n,* 99 Wn.2d at 841.[1] Findings of fact must be upheld if they are supported by substantial evidence *on the record considered as a whole.* A reviewing court must consider not only the evidence in support of a finding, but must also take into account *anything in the entire record that detracts from its weight. Universal Camera Corp. v. NLRB,* 340 U.S. 474, 95 L. Ed. 456, 71 S. Ct. 456 (1951). This is significantly broader than our traditional state substantial evidence test; it requires the reviewing court to consider the evidence both for and against the findings. It is apparent that the reviewing court is required to evaluate if not to weigh the evidence.

Sound policy supports this expanded role. The classic substantial evidence test is appropriate in cases where the court performs only classic appellate review and is not

---

[1]Although *Public Empl. Relations Comm'n v. Kennewick* adopted a particularized federal substantial evidence test, dicta in the case seems to confuse this with the APA test: reversal only if the decision is clearly erroneous, arbitrary or capricious, "as under" the APA, RCW 34.04.130(6). *Public Empl. Relations Comm'n,* 99 Wn.2d at 842. We think this was inadvertent. The APA clearly erroneous test permits the reviewing court to escape a substantial evidence standard and to reverse even in the presence of substantial evidence if it is firmly convinced that a mistake has been made. *Farm Supply Distribs., Inc. v. State Utils. & Transp. Comm'n,* 83 Wn.2d 446, 449, 518 P.2d 1237 (1974); *Kelso Sch. Dist. 453 v. Howell,* 27 Wn. App. 698, 701–02, 621 P.2d 162 (1980). However, the result may be the same, as will be seen, because, under the federal test adopted in *Public Empl. Relations Comm'n v. Kennewick,* the prerogatives of the reviewing court are similar to those conferred by the APA clearly erroneous test.

called upon to lend its coercive power to the proceedings. Enforcement cases differ; a court is called upon not only to review the administrative proceedings, but to enforce sanctions based upon findings of unfair labor practices. Thus it is appropriate—and important—that a court be satisfied that the administrative determination is correct. *See Public Empl. Relations Comm'n v. Kennewick,* 99 Wn.2d at 841.

The task confronting us is to utilize this standard in determining whether the Board properly applied to the evidence the dual motive test adopted in our previous opinion. *Washington Pub. Employees Ass'n,* 31 Wn. App. at 211. That test, commonly called the *Wright Line* test (*Wright Line v. Lamoureux,* 251 N.L.R.B. 1083 (1980)), involves two steps. First, the employee must present a prima facie case that he engaged in protected conduct, and that such conduct was a substantial or motivating factor in the employer's decision to fire him. Once the employee has carried this burden, the employer has the opportunity to show that the employee would have been terminated in any event.

The United States Supreme Court clarified the first step in *NLRB v. Transportation Management Corp.,* 462 U.S. 393, 76 L. Ed. 2d 667, 103 S. Ct. 2469 (1983), holding that in order to meet the initial prima facie burden, the employee must prove his case by a preponderance of the evidence. Having adopted *Wright Line* as part of our state law in our previous opinion, we now adopt this clarification as well.[2]

Our first inquiry, then, is whether Clayton established by a preponderance of the evidence that his protected activity—advocating a union shop—constituted *a* motive for Highline to fire him. Considering the entire record, we conclude that he did not.

The Board made several findings of fact purporting to

---

[2]The Board here purported to apply this requirement, reciting in its findings and conclusions that Clayton had carried his burden by a preponderance of the evidence.

support its conclusion that Clayton had met the burden imposed upon him by *Wright Line*. Some are mixed with conclusions; some are entirely conclusory. The summaries underscored below are followed by our evaluation based on the whole record.

1. Before the union shop election, Slaughter published an antiunion shop memorandum to all classified employees. Slaughter's memorandum consisted of rhetorical questions apparently intended to stimulate affected employees to consider both the advantages and disadvantages of a union shop. Its tone was neutral. No fair–minded person could describe it as antiunion.[3] Also, it had nothing at all to do with Clayton.

2. Clayton refused to sign an antiunion statement for general publication, presented to him by Eade's secretary. This finding is partly true but wholly deceptive. Ms. Sacks, in her individual capacity as a member of the bargaining unit, asked Clayton to sign a paper *opposing the union shop,* not opposing unions. She did this on her own, and she had the right to. The implication that she did it in her capacity as Eade's secretary is totally unsupported.

3. Eade's "Grumpy Editorial Comment" expressed his antiunion bias. It did not. It only expressed Eade's belief that all employees in the bargaining unit were free to speak their minds on the union shop issue regardless of their view.

4. Eade was "visibly disturbed" when Clayton told him, in the coffee room, that he (Clayton) supported the union shop. Only Clayton testified to this; others present did not. Whether or not Eade was disturbed is irrelevant. Nothing in the record shows that he remonstrated with Clayton or translated any disturbance into an effort to terminate him.

5. After the union shop election, Clayton's work was

---

[3]Another finding, which we need not discuss in detail, suggests that this was a violation of Board standards for the election apparently because it constituted "interference." Be that as it may, it had no connection at all with Clayton or his termination.

under "atypical" scrutiny, new demands were made on him without adequate training or time preparation, and concurrently his work began to deteriorate. Clayton's work was under scrutiny, as it should have been, but nothing in the record supports a conclusion that this was "atypical," whatever that means. No evidence supports the findings (or conclusions) concerning new demands, inadequate training or concurrency of the deterioration of Clayton's work. Clayton's work had always been bad, and it grew steadily worse.

In short, the record as a whole reveals that the Board's findings are based on a series of unrelated and insignificant—even trivial—events which, whether considered singly or collectively, do not constitute substantial evidence supporting a conclusion that antiunion animus was a motive in Clayton's termination. Even if some of these events might suggest antiunion feeling on the part of Clayton's supervisors, the record is devoid of any suggestion that this was focused on Clayton. One does not violate the law if "any antiunion animus that he might have entertained did not contribute at all to an otherwise lawful discharge for good cause." *NLRB v. Transportation Management Corp.,* at 398.

Because we hold that Clayton failed to carry his burden of proof on step one, we need not consider whether Highline met its burden under step two of the *Wright Line* test. However, some comment on this issue is appropriate.

The Board gave short shrift to the matter. Its only direct reference to it appears in its conclusion that "the employer did not meet its burden of demonstrating that it would have dismissed Mr. Clayton in the absence of his protected conduct in support of the union shop." The Board's findings are silent concerning Clayton's deficiencies except as related to pressures the Board fancied were generated by Highline.

The record contains overwhelming evidence of Clayton's seriously inadequate work, of Highline's repeated attempts to remedy the problem, of Clayton's inability or unwilling-

ness to respond, and of his refusal to accept a new position under a reorganization plan designed to resolve the problem. The Board apparently chose to ignore this evidence. We are hard put to understand why.

Reversed.

REED, J., concurs.

PETRICH, J. (concurring)—While I believe there may well be substantial evidence supporting a determination that antiunion animus was a motive in Clayton's termination, I am satisfied that there is substantial evidence on the record considered as a whole that Clayton would have been discharged absent any protected activity. Accordingly I concur in the ultimate result of reversal.

Reconsideration denied December 5, 1986.

Review denied by Supreme Court March 3, 1987.