[No. 16651-8-II. Division Two. December 1, 1995.]

VANCOUVER SCHOOL DISTRICT No. 37, *Respondent*, v. SERVICE EMPLOYEES INTERNATIONAL UNION, LOCAL 92, ET AL., *Appellants*.

906

*Christine O. Gregoire, Attorney General*, and *Spencer W. Daniels, Assistant*; and *Lawrence R. Schwerin, Michelle C. Mentzer*, and *Schwerin, Burns, Campbell & French*, for appellants.

*Dennis R. Duggan* and *Horenstein & Duggan, P.S.*, for respondent.

MORGAN, J. — Reversing the Public Employment Relations Commission (PERC), the superior court dismissed an unfair labor practice complaint brought against the Van-

couver School District by Service Employees International Union, Local 92. The union appeals; we affirm.

## FACTS

Unfortunately, a long statement of facts is needed. The Vancouver School District and Service Employees International Union, Local 92, entered into a collective bargaining agreement for 1989-91. It provided for a grievance procedure. It also provided, in article V, section 2, at 13, that "[e]very effort shall be made to develop an understanding of the facts and issues in order to create a climate which will lead to a solution [of a grievance]."[1]

During the 1989-90 school year, Robert Wilcox was a school bus driver for the Vancouver School District. He drove students to and from Walnut Grove Elementary School and Fort Vancouver High School. He and other school bus drivers were represented by the union and its business agent, Larry Church. The district's administrators included Robert Dolhanyk, supervisor of transportation, Michael Bruener, associate superintendent, and Dr. James Parsley, superintendent.

In October 1989, the parents of a Walnut Grove boy complained that Wilcox had grabbed him by his coat. In a subsequent meeting attended by Wilcox, Dolhanyk, and the Walnut Grove principal, Wilcox admitted the alleged conduct. Dolhanyk said Wilcox was not to grab students by the coat, and they went over the district's "write-up process" for initiating discipline due to misbehavior on a school bus. Wilcox agreed to desist from similar action in the future.

In December 1989, the parents of a Walnut Grove girl complained that Wilcox had pushed her. When interviewed by Dolhanyk, however, she said that Wilcox had just tapped her on the shoulder with two fingers. In a meeting with Dolhanyk, Wilcox admitted the conduct, and he and Dolhanyk discussed acceptable noncontact ways of obtaining children's immediate attention.

---

[1]Certified Record, Vol. II, Ex. 1.

On March 28, 1990, the parents of another Walnut Grove girl, then a fifth-grader, complained that Wilcox had grabbed her around the neck. According to the girl's later testimony, she was "fooling around," "[m]aybe a little bit," with two of her friends.[2] All three were sitting on a seat too narrow for three people. She was next to the aisle, and her two friends "were giggling and moving all over and kept pushing [her] off the seat . . . ."[3] Wilcox stopped the school bus, walked back to the girl, and ordered her to take an empty seat in front of her. Although she complied, he "leaned over . . . and started talking to [her]" angrily, using profanity.[4] Then, still according to the girl, "[h]e put his hands around [her] neck and started squeezing and shaking."[5] This hurt, and she started crying. When she got off, Wilcox "said something that scared [her] so [she] ran off the bus and started crying and [she] just ran home."[6]

Dolhanyk met with Wilcox early in the morning on March 30. Wilcox denied the alleged conduct and Dolhanyk suspended him, with pay, pending investigation.

Wilcox sought assistance from the union, and Church spoke several times with Bruener. Church was informed that the school principal and Dolhanyk were interviewing students from the bus. On April 22, Bruener disclosed the interview results, and Church asked that additional students be interviewed. The district complied.

At a meeting on May 8, 1990, Bruener informed Wilcox and Church that the investigation had been completed, and that he would be suspended without pay from May 8

---

[2]Certified Record, Vol. II, at 67.

[3]*Id.*

[4]*Id.* at 69.

[5]*Id.* at 70.

[6]*Id.* at 72.

through June 12, the last day of school.[7] Church responded that the union would conduct its own investigation.

Lucinda Warren substituted as the bus driver for Wilcox on the Walnut Grove route. At an unspecified time, but inferentially after the May 8 meeting, Church called her on the phone. According to Warren,

[h]e wanted me to get him a list of the kids on the bus from that last stop . . . or he was going to come on the bus and talk to the kids. Nothing was settled then about that.[8]

Warren called her dispatcher for instructions, her request was relayed from the dispatcher to Dolhanyk to Bruener, and Bruener said not to allow Church on the bus. She was not instructed about providing a list of children, and as far as she knew, that matter "was never resolved one way" or the other.[9]

On May 9, Church called Dolhanyk, seeking permission to ride the school bus so he could interview children who were potential witnesses to the March 28 incident.[10] Acting on Bruener's instructions, Dolhanyk said the answer

---

[7]The District's reasons were set forth in a letter from Bruener. It stated in part:

The district's investigation involved the interviewing of students as well as yourself. Based on this investigation, I have determined that your behavior on the day in question was unacceptable in that you lost control, became angry and improperly touched a student and used inappropriate language. Furthermore, you have had previous incidents of similar behavior this school year in which you lost control and improperly disciplined students by touching or grabbing them. . . .

This kind of conduct will not be tolerated in the future and any similar action will subject you to further disciplinary action . . . .

Certified Record, Vol. II, Ex. 3.

[8]Certified Record, Vol. II, at 185-86. A moment later, Warren reiterated by testifying that Church asked her "to get together a list . . . of the kids on the bus," "but [they] didn't conclude [she] would do that."

[9]*Id.* at 188.

[10]Church testified he did not ask to ride the bus on May 9, *id.* at 43, but PERC found to the contrary.

was no, and that future requests "needed to be cleared through Mr. Bruener's office."[11]

On May 10, Bruener sent Church a letter indicating the district would provide copies of the witness statements it had taken from children on the bus. The same day, according to Church's later direct examination, Church stated

> I talked with Mr. Bruener and told him that we would be out doing an investigation. We discussed between us the methods. He had some concerns about several things. I informed him we would be careful about those and we proceeded.[12]

During cross-examination, Church added:

> I told [Mike Bruener] that we were going to be out conducting an investigation talking with some of the kids. Mike and I discussed not doing that without parent permission; I agreed with him.[13]

The record does not show whether Church asked for, or Bruener refused, the addresses or phone numbers of the parents of potential witnesses; whether Church asked for, or that Bruener refused, help in arranging meetings between the union, each child witness, and each child witness' parent; whether the parties discussed any other alternatives; or whether Bruener refused any investigatory request made by Church, except for the request to ride the school bus.

Later on May 10, Church and Wilcox drove to the last stop on the Walnut Grove bus route, where they waited for the bus to arrive. Their purpose was "to speak with the students involved in the March 28, 1990 incident."[14] Wilcox was present because, according to Church, "he

---

[11]*Id.* at 216.

[12]*Id.* at 25.

[13]*Id.* at 44.

[14]*Vancouver Sch. Dist. 37*, Pub. Empl. Relations Comm'n Dec. 3779-A at 4 (P.E.C.B. 1992) (hereinafter PERC decision).

knew what students he wanted interviewed and I certainly didn't know who any of the students were."[15]

Before the bus came, Church spoke with a father who was there to pick up his child, and with a mother who had just pulled into her nearby driveway. Each said Church could interview his or her child.

When the bus arrived, it was occupied by Warren and about ten children. Church and Wilcox were standing outside Church's automobile. Seeing them, Warren kept the children on the bus and radioed the district for instructions. After a couple of minutes, she let the children off, but with instructions that they did not have to speak to the two men if they did not want to.

When the children got off, they "filtered through" Church and Wilcox.[16] As they did, Church and Wilcox asked where they lived and whether their parents were home. None of the children answered, and, according to Church, they "appeared to be scared and frightened."[17] Church and Wilcox allowed them to leave.

Some of the children from the bus, though not necessarily the ones who got off at the last stop, were cared for after school at a licensed daycare operated by Teresa Smith in her home. Within a short time, the Walnut Grove principal called Smith and told her Wilcox was in the neighborhood. Smith informed the children and a parent, Linda Poe, who was there to pick up her children. Poe was the mother of one of the three girls who, on March 28, had been sitting together on the bus.

Meanwhile, at the bus stop, Church interviewed the children from whose parents he had secured permission before the bus came. Then, he and Wilcox went to three other nearby homes. At two of the homes, Church spoke with the children after securing permission from the parents. At the third, the mother allowed Church to speak

---

[15]Certified Record, Vol. II, at 26.

[16]*Id.* at 28.

[17]*Id.* at 56; *see also id.* at 28.

with her children, but not with other parents' children whom she was also watching. At all three, Wilcox stayed in the car except when he got out to talk to another school bus driver who came by.

Church and Wilcox then drove to Smith's home, arriving shortly after the Walnut Grove principal called. Church approached the home while Wilcox remained in the car. Poe was in the front yard, and she demanded to know why Church was "harassing" the children from the bus. Church explained that he had not come to harass anyone, and that he was investigating on Wilcox's behalf. Poe said he could not speak with her child, and she told him to leave before she called the police.

Church returned to his car, with Poe following. There, Poe repeated that Wilcox could not contact her child, and that she would call the police if he and Church did not leave. Wilcox was in the car, and according to Poe's later testimony, he angrily said that Poe would "live to regret" her actions.[18] According to Church's later testimony, Wilcox said in a loud voice, with the car window open, "that they were going to pay for this, that he was going to sue them."[19] Church thought Wilcox's remark was directed to Church, not Poe, as Church pulled the car away from the curb. After Church and Wilcox left, they made no further attempt to contact children who might have witnessed the March 28 incident.

By the next day, May 11, a number of parents had complained to the district about Church's and Wilcox's attempt to contact their children at the bus stop. Church told Bruener what had happened, and Bruener determined that further investigation was required. Before investigating further, however, the district "wanted to immediately put a stop to the activity that had occurred," and "get something in the mail . . . that specifically said, stay away

[18]*Id.* at 157; *see also* PERC decision at 6.

[19]Certified Record, Vol. II, at 60; *see also id.* at 61.

from the Walnut Grove bus."[20] Thus, on May 14, 1990, Superintendent Parsley wrote Church and Wilcox a letter stating in pertinent part:

> Your actions and conduct on May 10, 1990 will not be tolerated by the Vancouver School District. . . .
>
> Please be advised that neither of you [is] to have any contact with any of the Walnut Grove students and/or staff, including the school bus and driver. If there should be any further contact with the students, staff and/or bus driver, or if either of you should come upon the Walnut Grove premises, I will notify the Clark County Sheriff's office and the prosecuting attorney's office and request that appropriate charges be filed. . . . Be further advised that any further contact as above outlined by Mr. Wilcox will be considered insubordination and breach of his employment cont[r]act with the Vancouver School District and I will recommend immediate termination.[21]

The letter did not purport to prohibit contact with parents whose children might have witnessed the March 28 incident. It did note, however, that several parents had retained legal counsel and would be seeking a "no contact" order.

On May 16, the union's attorney responded by faxing a letter to Parsley. It stated in pertinent part:

> Service Employees Local 92 represents Mr. Wilcox and is statutorily obligated to investigate the circumstances surrounding his suspension in order to properly represent him. The only way it can properly represent him is by interviewing the students who are potential witnesses. Local 92 has proceeded in an appropriate manner to do that, asking permission of parents before talking to any students.[22]

On May 18, 1990, Bruener sent Church a letter scheduling a meeting for May 21. The letter stated: "[T]he purpose

[20]*Id.* at 236-37.

[21]Certified Record, Vol. II, Ex. 5.

[22]Certified Record, Vol. II, Ex. 6.

of our meeting is to issue Mr. Wilcox a letter which indicates that the district has decided to terminate his employment . . . ."[23]

On May 21, Bruener met with Church as planned. Wilcox did not attend. Bruener gave Church a copy of a letter mailed that day to Wilcox. The letter stated in part:

> Please be advised that I have reconsidered my decision of suspending you from your work responsibilities without pay and have determined that justifiable and/or sufficient cause exists to terminate your employment with the Vancouver School District. Please be advised that your suspension without pay is hereby revoked and you are discharged and terminated from your employment with the Vancouver School District, effective May 8, 1990.[24]

According to the letter, the reasons for termination were the incidents of October 1989, December 1989, March 28, 1990, and May 10, 1990.

On May 31, 1990, the union filed the instant unfair labor practice complaint, alleging that the district had violated RCW 41.56.140. A hearing was held in January 1991. Wilcox was present but did not testify. On May 13, 1991, the hearings examiner dismissed the complaint, ruling that "[t]he contact with students on May 10, 1990 was not 'protected activity',"[25] and that the district had not committed an unfair labor practice.

The union petitioned for review of the examiner's decision, thus bringing the matter before PERC. On February 13, 1992, PERC reiterated most of the examiner's findings of fact. For two reasons, however, it rejected his conclusions of law, ruling instead that the district had engaged in an unfair labor practice. It stated that Wilcox's and Church's conduct on May 10 constituted protected activity and was a substantial factor in the district's decision to terminate. It also stated that the May 16 letter from the union's attorney to Parsley constituted protected activity

---

[23]PERC decision at 8.

[24]Certified Record, Vol. II, Ex. 9.

[25]*Vancouver Sch. Dist. 37*, Pub. Empl. Relations Comm'n Dec. 3779 at 19, (P.E.C.B. 1991) (hereinafter Examiner's decision), *rev'd*, Pub. Empl. Relations Comm'n Dec. 3779-A (P.E.C.B. 1992).

and was a substantial factor in the district's decision to terminate. Based on these rulings, it ordered the district to reinstate Wilcox with back pay, and to post a specified notice for at least sixty days.

The district sought judicial review from the Clark County Superior Court, pursuant to RCW 41.56.165 and RCW 34.05.570. On October 28, 1992, that court reversed and dismissed the unfair labor practices complaint. The union then appealed to this court.

ANALYSIS

■ According to all parties, the case is governed by the test set forth in *Wright Line, A Div. of Wright Line, Inc.*, 251 N.L.R.B. 1083 (1980), *enforced*, 662 F.2d 899 (1st Cir. 1981), *cert. denied*, 455 U.S. 989 (1982).[26] That test has been accepted by the United States Supreme Court, *NLRB v. Transportation Management Corp.*, 462 U.S. 393, 401-04, 103 S. Ct. 2469, 76 L. Ed. 2d 667 (1983), and by this court, *International Ass'n of Fire Fighters, Local 1445 v. Kelso*, 57 Wn. App. 721, 730, 790 P.2d 185, *review denied*, 115 Wn.2d 1010 (1990); *Highline Community College v. Higher Educ. Personnel Bd.*, 45 Wn. App. 803, 809, 727 P.2d 990 (1986), *review denied*, 107 Wn.2d 1030 (1987); *Clallam County v. Public Employment Relations Comm'n*, 43 Wn. App. 589, 598, 719 P.2d 140, *review denied*, 106 Wn.2d 1013 (1986); *Washington Pub. Employees Ass'n v. Community College Dist. 9*, 31 Wn. App. 203, 211-12, 642 P.2d 1248 (1982), *review denied*, 107 Wn.2d 1030 (1987). It involves two burdens, each to be met by a preponderance of evidence. *See Transportation Management Corp.*, 462 U.S. at 401 n.6. Initially, the union must prove that the employee's conduct constituted protected union activity, and that retaliation for such activity was a substantial or motivating factor in the employer's decision to discharge.

---

[26]As stated in the text, the parties have asserted the Wright Line test throughout this case. We filed our opinion on December 1, 1995. In a motion for reconsideration filed on December 20, 1995, Wilcox informed us, for the first time, that in July 1994 PERC abandoned the Wright Line test in favor of a substantial factor test patterned after *Wilmot v. Kaiser Aluminum & Chem. Corp.*, 118 Wn.2d 46, 71-73, 821 P.2d 18 (1991) and *Allison v. Housing Auth. of Seattle*, 118 Wn.2d 79, 96, 821 P.2d 34 (1991). *See Educational Service Dist. 114*, Pub. Empl. Relations Comm'n Dec. 4361-A (P.E.C.B. 1994). In the same motion, Wilcox asks us to reconsider and apply the new test. Believing that the assertion of a new test is untimely, we deny reconsideration.

If the union so proves, it is entitled to prevail unless the employer proves, essentially as an affirmative defense, that it would have discharged the employee even if the protected activity had not taken place. *See id.* at 401-03.

██ ██ Addressing PERC's reasoning in the context of this framework, the parties agree that the May 10 incident was a substantial or motivating factor in the district's decision to terminate, but they disagree over whether it was protected conduct. Conversely, they agree that the May 16 letter was protected conduct, but they disagree over whether it was a substantial or motivating factor in the district's decision to terminate. Thus, we consider (1) whether the May 10 incident involved protected activity, and (2) whether the letter dated May 16 was a substantial or motivating factor in the district's decision to terminate Wilcox. In considering these issues, we rely on federal decisions construing the National Labor Relations Act (NLRA), in addition to Washington law, because decisions construing the NLRA are persuasive when construing similar provisions of RCW 41.56. *City of Bellevue v. International Ass'n of Fire Fighters, Local 1604*, 119 Wn.2d 373, 383 n.2, 831 P.2d 738 (1992); *Nucleonics Alliance, Local Union 1-369 v. Washington Pub. Power Supply Sys.*, 101 Wn.2d 24, 32-33, 677 P.2d 108 (1984); *Community College Dist. 9*, 31 Wn. App. at 208. We review PERC's decision, as opposed to that of the examiner or superior court. *International Ass'n of Firefighters, Local 469 v. Public Employment Relations Comm'n*, 38 Wn. App. 572, 575-76, 686 P.2d 1122, *review denied*, 102 Wn.2d 1021 (1984).

I

Public employees and their unions have a right to collectively bargain. RCW 41.56.040.[27] If an employer interferes with this right, it commits an unfair labor practice.

---

[27]RCW 41.56.040 provides: "No public employer, or other person, shall directly or indirectly, interfere with, restrain, coerce, or discriminate against any public employee or group of public employees in the free exercise of their right to organize and designate representatives of their own choosing for the purpose of collective bargaining, or in the free exercise of any other right under this chapter."

RCW 41.56.140(1).[28] Collective bargaining is defined as "the performance of the mutual obligations of the public employer and the exclusive bargaining representative to meet at reasonable times, to confer and negotiate in good faith, and to execute a written agreement with respect to grievance procedures and collective negotiations on personnel matters . . . ." RCW 41.56.030(4).

The union argues that the right to collectively bargain includes the right to pursue a grievance. We agree.

> [W]e believe that because the Legislature included the execution of agreements relating to grievance procedures in its definition of collective bargaining, it must have intended that the pursuing of such grievances be a protected right under RCW 41.56.

*Clallam County*, 43 Wn. App. at 599; *see also id.* at 603 (Reed, J., dissenting).[29]

■ The union asserts that the right to pursue a grievance carries with it the right to investigate facts pertaining to the grievance. It further asserts that the right to investigate facts includes the right to contact witnesses for the purpose of seeking interviews. We agree with both assertions, for otherwise the right to pursue a grievance would be ineffective. Also, the parties' collective bargaining agreement provides in article V, section 2, at 13, that "[e]very effort shall be made to develop an understanding of the facts and issues in order to create a climate which will lead to a solution [of a grievance]."

---

[28]RCW 41.56.140 provides in part: "It shall be an unfair labor practice for a public employer: (1) To interfere with, restrain, or coerce public employees in the exercise of their rights guaranteed by this chapter."

[29]Likewise, in *NLRB v. City Disposal Sys., Inc.*, 465 U.S. 822, 832, 104 S. Ct. 1505, 79 L. Ed. 2d 839 (1984), the United States Supreme Court characterized the collective bargaining process as a single collective activity, beginning with the organization of a union and extending through the formation and enforcement of a collective bargaining agreement. The Court said: "[I]t would make little sense for § 7 [of the NLRA] to cover an employee's conduct while negotiating a collective-bargaining agreement, including a grievance mechanism by which to protect the rights created by the agreement, but not to cover an employee's attempt to utilize that mechanism to enforce the agreement." *Id.* at 836.

None of the foregoing rights is without limits. Thus, in *NLRB v. City Disposal Sys., Inc.*, 465 U.S. 822, 837, 104 S. Ct. 1505, 79 L. Ed. 2d 839 (1984), the United States Supreme Court said:

> The fact that an activity is concerted, however, does not necessarily mean that an employee can engage in the activity with impunity. An employee may engage in concerted activity in such an abusive manner that he loses the protection of § 7.

*Accord NLRB v. Washington Aluminum Co.*, 370 U.S. 9, 17, 82 S. Ct. 1099, 8 L. Ed. 2d 298 (1962) ("It is of course true that § 7 does not protect all concerted activities, but that aspect of the section is not involved in this case.").

To say that limits exist is not, of course, to say what they are. As one commentator has noted,

> The reach of § 7 [of the NLRA] has posed difficult questions involving the balancing of an employee's right to engage in concerted activities against the employer's right to maintain order and control in the plant. . . .

1 *The Developing Labor Law* 144 (Charles J. Morris et al. ed., 2d ed. 1983).

■ Here, the parties dispute what the applicable limits are. The district argues that employee activity loses its protection if it is unreasonable, and, implicitly, that unreasonableness is gauged in light of ordinary social intercourse. The union argues that employee activity does not lose its protection merely because it is unreasonable; rather, it must be "so flagrant, violent or extreme as to render the employee unfit for service."[30]

PERC appears to have used a reasonableness test in this case. Speaking generally, it said that "[s]o long as witnesses are contacted in a reasonable manner, the employer

---

[30]Br. of Appellant at 38.

has no right to prohibit such contacts."[31] Speaking of this case, it said that "the specific acts must be examined,"[32] and that Church's and Wilcox's activities at the bus stop were "reasonably related to the processing of the grievance protesting the suspension of Robert Wilcox, so as to be within the scope of 'protected activity' within the meaning of RCW 41.56.040."[33] It said that "[i]f behavior becomes too disruptive or confrontational, it loses the protection of the act";[34] however, it "did not find the actions of Church and Wilcox on May 10, 1990 so egregious as to fall outside the scope of statutorily protected activity of making a *reasonable* investigation concerning the Wilcox grievance."[35]

Parenthetically, the examiner and the superior court also used a reasonableness test. The examiner ruled, "Given the strong emotional reaction to the initial incident, and the nature of the underlying complaint, the complainant was not acting in a reasonable manner when Church and Wilcox approached children on May 10, 1990."[36] The examiner went on to say that the May 10, 1990 contact with the children "was not reasonable in the context of the existing circumstances," and thus was not protected activity.[37] The superior court ruled that the question "is whether the Union was engaged in a reasonable exercise of its right to investigate a grievance . . . ."[38] Answering no, the court held that the approach to the children was not protected activity.

The use of a reasonableness test is supported by

---

[31]PERC decision at 12.

[32]*Id.*

[33]*Id.* at 20-21.

[34]*Id.* at 13 (citing *Pierce County Fire Dist. 9*, Pub. Empl. Relations Comm'n Dec. 3334 (P.E.C.B. 1989).

[35]*Id.* at 15 (italics ours).

[36]Examiner's decision at 15.

[37]*Id.*

[38]Superior court's memorandum opinion, No. 92-2-00671-9 at 3 (Aug. 20, 1992) (clerk's papers at 160).

Washington law. In *State v. Fox*, 82 Wn.2d 289, 510 P.2d 230 (1973), *cert. denied*, 414 U.S. 1130 (1974), a union organizer was convicted of trespass after entering a privately owned migrant labor camp over the objections of the owner. The Washington State Supreme Court reversed the conviction, essentially on the ground that the organizer was engaging in protected activity. It said, "[A] union organizer has a right to go where necessary to meet with workers, *as long as his exercise of that right is reasonable.*" 82 Wn.2d at 293 (emphasis added).

The use of a reasonableness test is supported by cases construing the NLRA. The United States Supreme Court has said that employee activity loses its protection when it is unlawful, violent, in breach of contract, or "indefensibly" disloyal. *Washington Aluminum Co.*, 370 U.S. at 17; *see also NLRB v. Local Union 1229, International Bhd. of Elec. Workers*, 346 U.S. 464, 474, 74 S. Ct. 172, 98 L. Ed. 195 (1953) ("courts have refused to reinstate employees discharged for 'cause' consisting of insubordination, disobedience or disloyalty"). The Ninth Circuit, in an opinion written by Judge Fletcher, has explained that in cases in which employees contact third parties to a labor dispute, the disloyalty standard

> is at base a question of whether the employees' efforts to improve their wages or working conditions through influencing strangers to the labor dispute were pursued in a reasonable manner under the circumstances. Product disparagement unconnected to the labor dispute, breach of important confidences, and threats of violence are clearly unreasonable ways to pursue a labor dispute. On the other hand, suggestions that a company's treatment of its employees may have an effect upon the quality of the company's products, or may even affect the company's own viability are not likely to be unreasonable, particularly in cases when the addressees of the information are made aware of the fact that a labor dispute is in progress. Childish ridicule may be unreasonable, while heated rhetoric may be quite proper under the circumstances. Each situation must be examined on its own facts, but with an understanding that the law does favor a robust

exchange of viewpoints. The mere fact that economic pressure may be brought to bear on one side or the other is not determinative, even if some economic harm actually is suffered. The proper focus must be the manner by which that harm is brought about.

*Sierra Publishing Co. v. NLRB*, 889 F.2d 210, 220 (9th Cir. 1989); *see also* 48 AM. JUR. 2D *Labor and Relations* § 2014, at 1078 (citing *Sierra*) ("The question is whether employee efforts to improve their wages or working conditions by influencing strangers to the labor dispute are pursued in a reasonable manner under the circumstances."). Thus, employee activity loses its protection when it is unreasonable—but reasonableness is gauged by what a reasonable person would do in the midst of industrial strife, and not by what a reasonable person would do in the more ordinary affairs of life. Employee activity may be unreasonable when measured against ordinary social intercourse, yet reasonable in the context of a labor dispute.

The use of a reasonableness test is supported by additional cases in which an employee contacts strangers to a labor dispute (usually the employer's customers) with information about the employer. Sometimes the activity is protected,[39] but other times it is not.[40] Without the use of a reasonableness test, these cases represent a hodge podge

---

[39]*E.g., Sierra Publishing Co.*, 889 F.2d at 217 (newspaper employees sent letter to advertisers, seeking support in labor dispute; activity protected because "the journalistic quality of the paper was not impugned, and, despite the criticisms voiced in the letter, the tone was both constructive and hopeful."); *Emarco, Inc.*, 284 N.L.R.B. 832, 1987 WL 89746 at *4-5 (1987) (employees told employer's customer that employer "never paid [his] bills," "can't finish the job," and is "no damn good." Viewed in context of recent strike, remarks not "so disloyal, reckless, or maliciously untrue as to lose the Act's protection."); *Allied Aviation Serv. Co.*, 248 N.L.R.B. 229, 1980 WL 11228 at *4-5, *enforced*, 636 F.2d 1210 (3rd Cir. 1980) (employee sent letter to customers of employer, saying employer was using unsafe methods to fuel airplanes; activity protected because employees may ask third party for assistance in ongoing labor dispute, where communication does "not constitute a disparagement or vilification of the employer's product or its reputation.").

[40]*E.g., Local Union 1229, Int'l Bhd. of Elec. Workers*, 346 U.S. at 471-77 (employees of TV station "distributed 5,000 handbills making a sharp, public, disparaging attack upon the quality of the company's product and its business policies, in a manner reasonably calculated to harm the company's reputation

of ad hoc results, and of adjectives used to justify those results. With the use of a reasonableness test, reality becomes apparent: Reasonable employee activity is protected while unreasonable employee activity is not— but reasonableness is gauged in the context of the labor dispute, recognizing that the law favors "a robust exchange of viewpoints," and that economic pressure is a legitimate tool. *Sierra Publishing Co.*, 889 F.2d at 220.

The use of a reasonableness test is supported by the collective bargaining agreement formed by the parties to this case. As noted already, that contract provides, in article V, section 2, at 13, that "[e]very effort shall be made to develop an understanding of the facts and issues in order to create a climate which will lead to a solution [of a grievance]." Plainly, unreasonable efforts to investigate a grievance, and thus develop an understanding of the facts and issues, damage rather than enhance a climate in which a grievance can be solved. Thus, the language of the contract requires *reasonable* efforts to investigate the facts pertaining to a grievance.

Turning to the facts, we make four observations. First, the children were actually frightened and alarmed by Church's and Wilcox's approach at the bus stop. As

---

and reduce its income"; activities "indefensible" and not protected); *NLRB v. Truck Drivers, Local 705*, 630 F.2d 505, 508-09 (7th Cir. 1980), *cert. denied*, 450 U.S. 1030 (1981) (employees desiring raise distributed leaflets at political luncheon attended by employer's board members; activity not protected because of "reasonable basis for withholding the normal protections accorded to wage relief activity"); *American Arbitration Ass'n*, 233 N.L.R.B. 71, 1977 WL 9257 at *5 and *8-9 (1977) (dispute over dress code; employee sent questionnaire to employer's customers, asking, "Do jeans jackets look better on (a) dogs, (b) directors, (c) administrators, (d) all of the above, (e) none of the above?"; activity not protected because of breach of confidentiality, and because "questionnaire constitutes a holding up to ridicule of the [employer] . . . ."); *Kitty Clover, Inc.*, 103 N.L.R.B. 1665 (1953) (cited in *Sierra Publishing Co.*, 889 F.2d at 217 n.11) (employees engaged in protected activity while distributing handbills asking customers to boycott employer's products; but employees "passed the permissible limits" of protected activity when they announced, without substantiation, that employer used "diseased girls from North Sixteenth Street" and "skid row").

Church testified, they "appeared to be scared and frightened."[41]

Second, Church and Wilcox knew or should have known that by approaching elementary-age children getting off the school bus, they would cause fright and alarm, even though they only sought addresses and information on whether the children's parents were home at the time. Elementary-school children, because of their stage of development, generally lack the ability or capacity to decide whether they should speak with unfamiliar adults. The State of Washington recognizes this fact by providing that when a child under twelve is in court, a parent or other adult must waive the child's rights, including the child's right to remain silent. RCW 13.40.140(10) (second sentence). The responsible parent also recognizes this fact by teaching his or her child not to give out the child's address, and *especially* by teaching his or her child not to give out information on whether the parent is presently home. The responsible parent may even teach, particularly in situations in which a child goes home alone after school, that to disobey these instructions is to court danger. For these reasons, an adult contemplating an approach to elementary-age children on the street can and should foresee that they are likely to be frightened and alarmed by questions asking where the child lives and whether the child's parents are home.

Here, this generalized likelihood of fright was enhanced by the specific circumstances. Although Wilcox was acquainted with the children, he had been in conflict with them or their classmates on at least three occasions that school year, and he had been suspended immediately following the last occasion. Thus, his presence was likely to dismay the children more than if he were a stranger. Additionally, the substitute bus driver knew that Wilcox was engaged in disciplinary proceedings involving the children, and she, like the district itself, had a duty to use ordinary care for the children's well-being. *McLeod v.*

---

[41]Certified Record, Vol. II, at 56; *see also id.* at 28.

*Grant County Sch. Dist. 128*, 42 Wn.2d 316, 319-20, 255 P.2d 360 (1953); *J.N. v. Bellingham Sch. Dist. 501*, 74 Wn. App. 49, 56-57, 871 P.2d 1106 (1994). Thus, it was foreseeable that she would react to Wilcox's presence in some way—at a minimum by calling for instructions—and that her reaction would exacerbate the situation.

Third, not only was the children's fright foreseeable, it was also avoidable and unnecessary. Subject perhaps to appropriate conditions, the union had the right to obtain from the district the information reasonably needed to contact witnesses, for "collective bargaining includes the duty to provide relevant information the other party needs to carry out its collective bargaining responsibilities." *International Ass'n of Fire Fighters, Local 1604*, 119 Wn.2d at 383; *see also NLRB v. Acme Indus. Co.*, 385 U.S. 432, 435-36, 87 S. Ct. 565, 17 L. Ed. 2d 495 (1967); *Pullman Sch. Dist.*, Pub. Empl. Relations Comm'n Dec. 2632 (P.E.C.B. 1987). The record does not show that Church demanded such addresses from a person of authority at the district (as opposed to the substitute bus driver), or that a person of authority at the district refused to provide such addresses. Moreover, even if a demand had been made and refused, relief was still available through PERC. *Id.* at 14; *City of Yakima*, Pub. Empl. Relations Comm'n Dec. 1124 at 4, *rev'd on other grounds*, Pub. Empl. Relations Comm'n Dec. 1124-A at 5 (P.E.C.B. 1981). In short, the desired information was available through adults, and there was no need to approach elementary-age children in the absence of, and without the permission of, their parents.

Fourth, the activities at the bus stop were disruptive to the district in its role as supervisor of the children. In circumstances like those here, a school district occupies at least two roles: On the one hand, it is the employer of the employee; on the other, it is the supervisor of the children, to whom it owes a duty of reasonable care. *Bellingham Sch. Dist. 501*, 74 Wn. App. at 56-57; *Peck v. Siau*, 65 Wn. App. 285, 292, 827 P.2d 1108, *review denied*, 120 Wn.2d 1005 (1992). An employee involved in a labor

dispute often has the right to challenge, interfere with or disrupt a district's exercise of its role as employer. Rarely if ever, however, should an employee have the right to interfere with or disrupt a district's exercise of its role as the supervisor of children, at least where elementary-age children are involved. Here, the district was exercising its role as supervisor as the children got off the bus, and Church and Wilcox interfered with that role by approaching the children with neither parental nor district permission.

 Based on these observations, we conclude that Church's and Wilcox's approach to the children at the bus stop was not a reasonable exercise of their right to investigate, even when it is recognized that a labor dispute was in progress. As a consequence, Church's and Wilcox's activities at the bus stop were not protected by RCW 41.56, and the district did not commit an unfair labor practice when it considered such activities in deciding to terminate Wilcox's employment.

In holding that Church's and Wilcox's activities at the bus stop were unprotected, we do not hold that it was unreasonable for Wilcox and Church to approach parents, seeking permission to interview their children. From the beginning, the issue has been Church's and Wilcox's "May 10, 1990 contact with students."[42] It has not been their contact with parents.[43] We assume that Church and Wilcox had the right to contact parents in order to obtain permission to interview children who might have witnessed the March 28 incident, and also the right to obtain addresses or phone numbers for that purpose.

Nor do we hold that it would have been unreasonable for Church and Wilcox to approach children twelve or older. *Cf.* RCW 13.40.140(10) (second sentence). Our hold-

---

[42]Examiner's decision at 11.

[43]After the first hearing in the case, the hearing examiner commented: "The record reflects that several students were contacted only after parental approval was obtained. Such contact is not at issue in this case." *Id.* at 14; *see also id.* at 11.

ing is limited to the facts of this case, which involve an approach to children under twelve without first obtaining the permission of their parents.

■ The union argues that we should defer to PERC's conclusion of reasonableness. We are obligated to do that, *International Ass'n of Fire Fighters, Local 1604*, 119 Wn.2d at 382, but we are not obligated merely to rubber stamp PERC's decision. We would agree with PERC if this case involved only the conflict typical in PERC's cases, i.e., conflict between an employee's interest in enjoying the benefits of collective bargaining, and an employer's interest in maintaining order and control in the conduct of its business. *See* 1 *The Developing Labor Law, supra,* at 144 (quoted above). As PERC noted, however, this case involves much broader interests of the whole community, for it involves young children who should not be brought into a labor dispute without the parties to the dispute obtaining permission from parents or an order from an appropriate tribunal.[44] It is the business of the courts to consider and balance the interest of a community in its children, and we think that PERC failed to do that adequately. Like the hearing examiner and the superior court, we reach a result different from PERC's.

## II

■ The next issue is whether the May 16 letter was a substantial or motivating factor in the district's decision to terminate. This is a question of fact reviewed under the substantial evidence standard. Evidence is substantial when it is sufficient to persuade a fair-minded person that the declared premise is true. *Olmstead v. Department of Health, Medical Section*, 61 Wn. App. 888, 893, 812 P.2d 527 (1991). In alternative and more specific terms, evidence in this case is substantial if, taking it in the light

---

[44]PERC commented that "[b]ecause of the nature of the March 28th incident, *and the local community's special sensitivity to potential threats against its children,* it would no doubt have been preferable" for Wilcox not to have approached the children on May 10. PERC decision at 14 (emphasis added).

most favorable to the union, a rational trier could find, according to a preponderance of the evidence, that a substantial or motivating factor in the district's decision to discharge Wilcox was the May 16 letter. *See In re C.B.*, 61 Wn. App. 280, 285, 810 P.2d 518 (1991).

Here, neither the hearing examiner nor PERC made an express finding that the letter of May 16 was a substantial or motivating factor in the district's decision to terminate Wilcox. PERC reasoned, however, (1) that on or before May 14, the district must have decided not to fire Wilcox due to the events on May 10, because the superintendent's May 14 letter said "any further contact" would result in a recommendation of termination; (2) that by May 18, the district had decided to terminate Wilcox; and (3) that the only occurrence between May 14 and May 18 was the May 16 letter. Thus, "[t]he timing of these events supports the conclusion that the employer's decision to discharge Wilcox was motivated by the union's insistence on its right to interview witnesses,"[45] and the district committed an unfair labor practice "*either* in reaction to the letter . . . *or* in reaction to the grievance investigation activities . . . on May 10 . . . ."[46]

The flaw in this reasoning is that the evidence clearly shows the district never had any objection to "the union's insistence on its right to interview witnesses," provided that parental permission was obtained first. Bruener stated as much in his May 10 conversation with Church, according to Church's own testimony. Because the May 16 letter asserted no more than a right to interview children by "asking permission of parents before talking to any students,"[47] there is no reasonable inference, and no substantial evidence, that the district fired Wilcox due to the May 16 letter.

 The union relies on *City of Olympia*, Pub. Empl.

---

[45]PERC decision at 11.

[46]*Id.* at 15 (emphasis added).

[47]Certified Record, Vol. II, Ex. 6, at 2.

Relations Comm'n Dec. 1208-A (P.E.C.B. 1982), but that case is inapposite. In *City of Olympia*, PERC found that the timing of certain events "certainly raise[d] suspicion of wrongful discharge." *Id.* at 2. "Suspicion" is not substantial evidence, and PERC relied on a variety of other evidence before concluding that substantial evidence was present. In the instant case, PERC purported to rely on timing alone; as in *City of Olympia*, timing may raise suspicion, but without more it does not constitute substantial evidence, at least under the circumstances present here.

The judgment of the superior court is affirmed.

BRIDGEWATER, J., concurs.

PETRICH, J.* (dissenting) — In its quest to evaluate what it characterizes as the reasonableness of Wilcox and Church's activities in investigating the Board's allegations, the majority improperly partakes in a fact-finding mission of its own. The law is well-settled that an appellate court reviewing a decision of an administrative body does not try the facts de novo but accepts the facts of the administrative body provided they are supported by substantial evidence. RCW 34.05; *Franklin County Sheriff's Office v. Sellers*, 97 Wn.2d 317, 646 P.2d 113 (1982), *cert. denied*, 459 U.S. 1106 (1983); *Renton Educ. Ass'n v. PERC*, 101 Wn.2d 435, 680 P.2d 40 (1984); *Clallam County v. PERC*, 43 Wn. App. 589, 719 P.2d 140, *review denied*, 106 Wn.2d 1013 (1986).

Had the majority accepted the facts supported by the evidence as established by PERC, it would be compelled to reach the same conclusion as PERC. Instead, it appears to make its own factual determinations from evidence it found in the record that were not a part of PERC's findings. By doing so, the majority affords weight to those facts, allowing it to reach a different conclusion. In apply-

---

*John A. Petrich is serving as a judge pro tempore for the Court of Appeals, pursuant to CAR 21(c).

ing weight to those facts, the court is usurping the role of the administrative body, whose duty it is to weigh the evidence.

Even assuming the majority considers "reasonableness" to be a question of law, it is still bound by the factual determinations of the administrative agency that are supported by the evidence. *Franklin County*, 97 Wn.2d 317. The majority, in simple passing, claims that it is not a rubber stamp, somehow implying that this court has the power to conduct a de novo review when it disagrees with the agency's conclusions. The majority cites no authority for this statement. Nor could it.

The following explanation by PERC of its decision readily rejects the majorities "four observations" for denying the status of protected activity to the conduct of Church and Wilcox on May 10, 1990.

> The record indicates that, prior to directly contacting students, Church had asked the employer for permission to interview students on the school bus. The employer denied that union request, and did not suggest any joint or cooperative interview process. Church had asked the substitute bus driver for the names and addresses of students who rode the bus, but he had not been provided that information. Finally, Church had given Bruener advance notice that the union would try to talk with the students. The record also indicates that Bruener made, and Church acknowledged, an admonition that the union should not interview students without parental permission.

> The only contacts made with students on May 10, 1990 were either made with parental permission, or limited to asking the students for information designed to obtain parental permission before further conversation. There is no evidence that either Wilcox or Church harassed any of the students. Wilcox approached only a couple of students, and only asked those if their parents were home and where they lived. There is no evidence that he pursued the children in any way, or that he verbally threatened them when they did not respond to his inquiries.

> Because of the nature of the March 28th incident, and the

local community's special sensitivity to potential threats against its children, it would no doubt have been preferable if Wilcox had not approached any students at all on May 10, 1990. We cannot agree, however, that the limited contacts he had with students on that date should deprive Wilcox of the protections of the collective bargaining statute.

Wilcox's mere presence and approach could have had the unintended effect of frightening some students, but the actions of the substitute bus driver, first in refusing to let the students off the bus and then in telling them they did not have to talk to Church and Wilcox, had no doubt already heightened the anxiety of the students on the bus. So too at Smith's house, where a call from the school principal triggered alarm before Church and Wilcox ever arrived or had any opportunity to explain the reason for their visit. Consequently, it is unfair to hold Church and Wilcox solely responsible for the fact that some children might have become frightened by their presence.

The record indicates that several parents cooperated in the union's investigation, and that Linda Poe was the first parent to express any objection to Church and Wilcox being in the neighborhood. Once Poe voiced her objection, Church and Wilcox left the area, and did not try to contact any more students or their families.

The employer has acknowledged that it increased the disciplinary action from a suspension to a termination based on those May 10th actions. In light of the foregoing, we do not find the actions of Church and Wilcox on May 10, 1990 so egregious as to fall outside the scope of the statutorily protected activity of making a reasonable investigation concerning the Wilcox grievance.

Clerk's Papers at 25-26 (footnote omitted).

I would reverse the superior court and direct reinstatement of the Commission's decision.

After modification, further reconsideration denied January 19, 1996.

Review denied at 129 Wn.2d 1019 (1996).