[No. 26783-7-II. Division Two. January 11, 2002.]

THE DEPARTMENT OF REVENUE, *Appellant*, v. SECURITY PACIFIC
BANK OF WASHINGTON NATIONAL ASSOCIATION, ET AL.,
*Respondents.*

796

*Christine O. Gregoire, Attorney General*, and *Donald F. Cofer, Senior Counsel*, for appellant.

*John H. Parnass* (of *Davis Wright Tremaine*), for respondents.

BRIDGEWATER, J. — The Washington State Department of Revenue (Department) appeals from a Board of Tax Appeals (Board) order, which refunded to Security Pacific Bank of

Washington National Association (Security) some of the taxes that it paid between 1982 and 1992. The taxes were for the interest that Security earned on the advances that it made to mortgage companies. Mortgage companies used the advances to fund loans to third-party borrowers, which were primarily secured by first lien deeds of trust on nontransient residential properties. We affirm, holding that Security was entitled to a deduction under RCW 82.04.4292.

## FACTS

### Mortgage Warehouse Lending

Mortgage companies originate real estate mortgage loans. They earn their money primarily from origination fees charged to customers and from servicing the loans, not from interest earned on the mortgage loans. Because they lack sufficient working capital, mortgage companies turn to banks, like Security, to finance their origination activities.

Security loaned money to mortgage companies under revolving lines of credit. Mortgage companies used the advances from Security to fund loans to third-party borrowers; these loans were of various kinds and were primarily secured by first lien deeds of trust on various types of nontransient residential properties. Between 1982 and 1992, Security paid business and occupation (B&O) taxes under RCW 82.04.290 on the interest it earned on such loans.

Security regarded mortgage companies as high risk borrowers because they lack significant assets (other than the mortgage loans they originate) and have high debt-to-worth ratios (10 to 1). Security's other customers generally carried debt-to-worth ratios of 2 to 1 or 3 to 1. The credit risks presented by the mortgage companies are the reason that Security required full assignment of the mortgage loans. In fact, Security would not have extended credit to the mortgage companies without the assignments.

Between 1982 and 1992, Security received thousands of assigned loans. Each assignment had four elements: (1) the

"[o]riginal note, endorsed in blank"; (2) an "[a]ssignment of deed of trust, executed but unfiled"; (3) the "[o]riginal filed [d]eed of [t]rust, or a copy thereof and a trust receipt therefor"; and (4) a "[c]ollateral transmittal letter." Ex. 1421. Security would not advance money to a mortgage company until it received full assignment.

### Original Note

The mortgage company assigned the original promissory note signed by the homebuyer to Security. The mortgage company endorsed the note "in blank" and delivered it to Security. The note was endorsed in blank because Security and the mortgage company realized that the note would soon be sold on the secondary market, which we discuss below.

### Assignment of Deed of Trust

The mortgage company also assigned the first lien deed of trust the customer signed. Security's standard form assignment stated that the mortgage company transferred "[a]ll beneficial interest" under each deed of trust to Security. Report of Proceedings (RP) at 121. The original beneficiary (the mortgage company) endorsed the assignment, but Security did not file it because the loan was usually sent to the secondary market within days. It would have been impractical to file the assignment for the short period of time that Security owned the loan.

### Trust Receipt

Security also received a trust receipt executed by the mortgage company, confirming its status as owner of the loan and deed of trust. Under the trust receipt, Security temporarily entrusted possession of the original deed of trust back to the mortgage company (which acted as its trustee), pending sale of the loan on the secondary market.

By the late 1980s, Security began to replace the trust receipt with a bailment letter. Under this method, Security would ship the loans directly to the secondary market investor instead of entrusting possession of the loans to the mortgage company.

*Collateral Letter*

The mortgage company confirmed in the collateral transmittal letter that we "[h]ereby assign to [Security] all of our rights, title, and interest in the described instruments and documents," including the note and deed of trust. RP at 128.

Secondary Market

Within relatively short periods (a few days to a few months), some of the loans now assigned to (owned by) Security were sold to secondary market investors.[1] Proceeds from these controlled sales were sent directly to Security to pay down the mortgage companies' debt.

Each assigned loan remained subject to Security's ownership until its sale on the secondary market. This is the manner in which Security put its capital at risk and "bridged the gap" to the secondary market. Clerk's Papers (CP) at 29. The Department granted the deduction, under RCW 82.04.4292, to secondary market investors because they obtained beneficial ownership of the loans after purchasing them. *See* 8 Washington Tax Determination (WTD) at 241, 245 (1989). But it contested Security's refund status.

Procedural History

In December 1986, Rainer National Bank, Security's predecessor, filed an excise tax refund action under RCW 82.32.180 in superior court.[2] Security claimed that under RCW 82.04.4292, it was entitled to a deduction for the interest it earned on loans primarily secured by residential first deeds of trust.

In September 1987, the parties agreed that Security's superior court complaint would be treated as a refund

---

[1] The mortgage companies retained other loans in their portfolios for longer periods (several months to a few years).

[2] In 1987, Security purchased Rainier National Bank, which initiated this action. Security merged with Seattle-First National Bank (Seafirst) in 1992. Bank of America later acquired Seafirst.

application with the Department under RCW 82.32.060 and RCW 82.32.170. In December 1992, the Department denied the portion of Security's refund application concerning the revolving lines of credit. 13 WTD at 222 (1992). The Department gave two reasons for its decision.

First, if a mortgage company defaulted on its obligation under the credit agreement, Security could not foreclose against the real property subject to the deeds of trust.[3] The Department explained that Security's remedy was to assume ownership of the assigned promissory notes of the mortgage company's customers (i.e., the homeowners).

Second, the mortgage companies assigned the promissory notes and deeds of trust to Security for collateral purposes only. The Department reasoned that the "beneficial interest" in the promissory notes and deeds of trust remained with the mortgage companies, which continued to collect the mortgage payments and use them to repay their loans from Security. 13 WTD at 226. The Department concluded that only the beneficial or true owner of a loan could receive the deduction.

In May 1993, Security appealed to the Board of Tax Appeals and requested a formal hearing under the Administrative Procedure Act. The Board held a formal hearing in November 1995.

At the hearing, Security argued that the deduction applied because Security took beneficial ownership of the underlying loans by virtue of the assignments. The Department argued that the deduction did not apply because the mortgage companies were the true owners of the loans and that Security acquired only a personal property security interest via the assignments.

In May 1996, the Board issued a memorandum opinion reversing the Department's determination and granting

---

[3] Under the credit agreement, Security could foreclose against the real property subject to a deed of trust only if the home buyer defaulted on his or her promissory note.

the deduction to Security. The Board found that Security obtained beneficial ownership of the loans because of the assignments.

The Board stated that it would enter a "[f]inal [d]ecision" consisting of formal findings and conclusions after Security submitted proposed findings and conclusions. Ex. 477 n.1. In its final decision, the Board vacated the Department's determination and remanded the matter to the Department's audit division to compute the refund amount. After the Department filed a motion for reconsideration, the Board corrected the record and amended its previous findings and conclusions. In April 1997, the Board issued an amended final decision, vacating the Department's determination and directing it to refund the amounts set forth in the parties' stipulation.

The Department then filed another motion for reconsideration. It claimed that the amended decision was improper because the Board had not decided every material issue presented—specifically, whether a closing agreement executed by the parties barred refunds for tax years 1986 through 1990. In addition, the Department argued that the amended decision incorrectly decided the exemption issue because Security held only a security interest in the loans that the mortgage companies pledged as collateral.

In June 1997, the Board issued a second amended final decision, which added four findings and a conclusion concerning the closing agreements to its earlier amended final decision. In July 1997, the Department appealed the Board's second amended decision to the superior court.

In November 2000, the superior court affirmed the Board's decision "in all respects." CP at 143. The Department now appeals to this court.

## ANALYSIS

### Standard of Review

When reviewing an administrative decision, we stand in the same position as the superior court, *Swoboda*

*v. Town of La Conner,* 97 Wn. App. 613, 617, 987 P.2d 103 (1999), *review denied,* 140 Wn.2d 1014 (2000), and apply the appropriate standard of review directly to the administrative record. *Wilson v. Employment Sec. Dep't,* 87 Wn. App. 197, 200, 940 P.2d 269 (1997). RCW 34.05.570(3) sets forth the standards of judicial review for administrative orders.[4] Thus, our review is to evaluate whether the Board erroneously interpreted or applied the law and whether substantial evidence supports the order. "Evidence is substantial when it is sufficient to persuade a fair-minded person that the declared premise is true." *Vancouver Sch. Dist. No. 37 v. Serv. Employees Int'l Union, Local 92,* 79 Wn. App. 905, 927, 906 P.2d 946 (1995), *review denied,* 129 Wn.2d 1019 (1996).

■■ We review the evidence and any reasonable inferences in the light most favorable to the party that prevailed in the highest forum exercising fact finding authority. *Schofield v. Spokane County,* 96 Wn. App. 581, 586, 980 P.2d 277 (1999). We "may not substitute [our] findings for those of the trial court." *Sparks v. Douglas County,* 127 Wn.2d 901, 910, 904 P.2d 738 (1995).

In this case, the Board found that Security was entitled to the deduction because its advances were secured by real estate. The Board based its conclusion upon findings. If substantial evidence supports the findings, then we are to affirm the Board.

---

[4] This statute, in relevant part, provides:

The court shall grant relief from an agency order in an adjudicative proceeding only if it determines that:

. . . .

(d) The agency has erroneously interpreted or applied the law;

(e) The order is not supported by evidence that is substantial when viewed in light of the whole record before the court, which includes the agency record for judicial review, supplemented by any additional evidence received by the court under this chapter[.]

RCW 34.05.570(3)(d)-(e).

### RCW 82.04.4292: The "first mortgage" or "trust deed" deduction

■■■ RCW 82.04.4292 creates an interest deduction for "those engaged in banking, loan, security or other financial businesses, [of] amounts derived from interest received on investments or loans primarily secured by first mortgages or trust deeds on nontransient residential properties." RCW 82.04.4292. The purpose of RCW 82.04.4292 "was to stimulate the residential housing market by making residential loans available to home buyers at lower cost through the vehicle of a B&O tax [deduction] on interest income received by home mortgage lenders." CP at 33. Under the plain language of the statute,[5] the deduction created by RCW 82.04.4292 is available to any bank if its loan is "primarily secured by first mortgages or trust deeds on nontransient residential properties." RCW 82.04.4292.

A. *Findings that lack substantial evidence: justified challenges, which have no import*

(1) Did mortgage companies lend money only to home owners or home buyers?

■ The Department assigns error to the Board's findings to the extent they suggest that mortgage companies made loans only to "home owners" or "home buyers." It argues that such findings conflict with the parties' stipulation and are unsupported by substantial evidence.[6] There is merit to the Department's argument. Any resulting error, however, was harmless because there was no prejudice.[7]

■ The deduction covers loans primarily secured by trust deeds on nontransient residential properties. The

---

[5] Statutory interpretation begins with the plain language of the statute. *Lacey Nursing Ctr., Inc. v. Dep't of Revenue*, 128 Wn.2d 40, 53, 905 P.2d 338 (1995).

[6] Generally, stipulated facts are binding on the parties and the court. *Ross v. State Farm Mut. Auto. Ins. Co.*, 132 Wn.2d 507, 523, 940 P.2d 252 (1997).

[7] *See In re Welfare of McGee*, 36 Wn. App. 660, 663, 679 P.2d 933 ("[E]rror without prejudice is no basis for reversal."), *review denied*, 101 Wn.2d 1018 (1984); *see also Boeing Co. v. Harker-Lott*, 93 Wn. App. 181, 186, 968 P.2d 14 (1998) ("An error is prejudicial if it affects the outcome of the trial."), *review denied*, 137 Wn.2d 1034 (1999).

Department previously determined that "nontransient residential properties" include, but are not limited to: (1) single family residences of one to four units; (2) apartments; (3) permanent care nursing homes; (4) permanent care convalescent homes; (5) nontransient trailer park sites; and (6) construction loans for residential property. DEP'T OF REVENUE, EXCISE TAX ADVISORY (ETA) No. 460.04.146 (July 17, 1974), *available at* http://dor.wa.gov/eta/460.pdf (last modified July 1, 1998). Therefore, the deduction covers loans to residential borrowers other than "home buyers" or "home owners." Consequently, the Department's alleged error is immaterial because under the stipulation, any refund owed to Security would be limited to those loans that met the deduction's requirements.

> (2) That all of the advances made by Security were short term; and did the mortgage companies sell the loans they originated within days?

The Department assigns error to the Board's findings to the extent they suggest that every advance Security made to the mortgage companies was "short-term" or that the mortgage companies sold each loan they originated within days. It argues that such findings conflict with the parties' stipulation and are unsupported by substantial evidence.

▮ Again, although there is merit to the Department's argument, any resulting error was harmless. As Security points out, the deduction does not depend on whether the advances it made were short-term or whether the mortgage companies sold the loans they originated within days. Instead, the deduction depends on whether the loans were secured by trust deeds on nontransient residential properties.

> (3) Interest rates that Security charged the mortgage companies

The Department assigns error to a finding of fact to the extent it implies that the interest rates Security charged the mortgage companies were always equal to the prime

rate. It argues that such a finding is unsupported by substantial evidence.

■ Once more, although this argument has merit, any error it caused was harmless. As Security points out, although higher interest rates generate larger deductions, the rates it charged did not affect the availability of the deduction. In addition, the parties stipulated to the refund amount should the Board affirm its final order. As such, the alleged error is immaterial to the Board's order.

    (4)  Methods used to ship the loans to the secondary market investors

The Department assigns error to a finding to the extent it implies that Security always shipped the loans directly to the secondary market investors. It argues that such a finding is unsupported by substantial evidence.

The Department is referring to the fact that Security did not ship the loans directly to the secondary market until it implemented the bailment letter system in the late 1980s or early 1990s. Prior to that time, the loans passed through the hands of the mortgage companies under trust receipts.

■ But one of the Board's unchallenged findings (finding 29) states that between "1982 to 1989, the loans were shipped to investors through a trust agreement with the mortgage companies" and that "[l]ater, some of the loans were also transferred to the secondary market by bailment letter." CP at 29-30. This finding shows that the Board was aware of the methods of shipment used to transfer the loans to the secondary market. The alleged error fails because "findings of fact and conclusions of law must be read as a whole." *State v. Hinds*, 85 Wn. App. 474, 486, 936 P.2d 1135 (1997).

That these findings lack substantial evidence is of no avail to the Department because they do not speak to the issue in the statute—that is, whether the loans were secured by trust deeds on nontransient residential properties and assigned to Security.

B. *Challenges to the Board's findings on the central issue*

(1) Did the assignments transfer ownership of the loans to Security?

The Department assigns error to the Board's findings to the extent they imply that the "assignments" transferred ownership of the loans to Security. It argues that such findings are unsupported by substantial evidence and contradict some of the Board's other findings. The Department claims that several of the Board's findings establish that the assignments were only for security purposes and did not transfer ownership of the mortgage loans to Security.

■ Security answers that the Board's findings are neither contradictory nor inconsistent because they must be read as a whole. *Hinds*, 85 Wn. App. at 486. It argues that findings 33, 37, and 38[8] alone support the Board's final order. "A judgment will be upheld if one or more inconsistent findings supports the judgment."[9]

Security is correct. Even assuming, without holding, that the Board's findings are contradictory, findings 33, 37, and 38 support the conclusion that the assignments transferred

---

[8] Finding 33 provides:

Pursuant to these loan agreements, the mortgage companies were required to execute and deliver to [Security] an assignment of deed of trust with respect to each originated loan. The assignment of deed of trust shows that [Security] received "all beneficial interest" in the originated loan upon assignment. This "beneficial interest" passed to [Security] with respect to each and every loan originated by the mortgage company and funded by [Security].

CP at 30-31.

Finding 37 provides: "Neither the mortgage companies nor the home buyers were eligible for unsecured credit. It must follow that the primary security for [Security]'s loans to mortgage companies were the assigned underlying deeds of trust." CP at 31.

Finding 38 provides: "The assignments of beneficial interest from the mortgage companies to [Security] were a fundamental part of the bargained for consideration received by [Security] in exchange for credit advances." CP at 31-32.

[9] *In re Marriage of Getz*, 57 Wn. App. 602, 606, 789 P.2d 331 (1990); *see also Lloyd's of Yakima Floor Ctr. v. Dep't of Labor & Indus.*, 33 Wn. App. 745, 752, 662 P.2d 391 (1982) ("Assuming findings of fact 3 and 8 are inconsistent, the judgment will be upheld if one or more finding supports the judgment."); *cf. Sherrell v. Selfors*, 73 Wn. App. 596, 600-01, 871 P.2d 168 ("Conflicting evidence is substantial if that evidence reasonably substantiates the finding even though there are other reasonable interpretations."), *review denied*, 125 Wn.2d 1002 (1994).

ownership of the mortgage loans from the mortgage companies to Security. Furthermore, the record contains substantial evidence that the assignments transferred ownership of the loans to Security.[10]

    (2)  Were the loans secured only by the assigned promissory notes?

The Department assigns error to the Board's findings to the extent they imply that the loans Security made were primarily secured by the deeds of trust rather than the promissory notes the mortgage companies pledged. It argues that such findings are unsupported by substantial evidence. In other words, the Department argues that the loans Security made were secured only by the assigned promissory notes. This argument is unpersuasive.

A promissory note is merely a promise to pay—it is not security.[11] A deed of trust however, provides security to back a promise to pay and can be foreclosed after default on the note.[12]

If the Department's argument were correct, then Security received no real property collateral for the millions of dollars it advanced to the mortgage companies. The Board rejected this absurdity[13] and found that "[t]he assigned

---

[10] See RP at 100 (Security received assignments of the loans the mortgage companies made to the mortgage borrowers); RP at 101 (the assignments of the loan are significant because Security received the real estate and all the rights of the . . . real estate and the power to foreclose if necessary) RP at 120-21 (Security received an assignment of deed of trust in connection with each loan assigned to it); see also Ex. 1423-24 (representative assignment of deed of trust); Ex. 1426-27 (representative deed of trust); Ex. 1429 (representative trust receipt); Ex. 1431 (representative transmittal letter); Ex. 1512-1532 (representative credit agreement between Security and a mortgage company); Ex. 1545-1576 (representative promissory note).

[11] See Reid v. Cramer, 24 Wn. App. 742, 744, 603 P.2d 851 (1979) ("Between the two contracting parties, a note is only a simple contract to pay money."); Vancouver Nat'l Bank v. Katz, 142 Wash. 306, 313, 252 P. 934 (1927) (same); see also RP at 95 (when asked what the term "unsecured" meant, Security's witness answered: "There's no collateral. There's only a note, promise to pay.").

[12] See Kezner v. Landover Corp., 87 Wn. App. 458, 465, 942 P.2d 1003 (1997) (deeds of trust are a "security device" that "may be enforced by nonjudicial foreclosure"), review denied, 134 Wn.2d 1020 (1998); cf. RCW 70.105D.020(22) ("Security interests include deeds of trusts[.]").

[13] See CP at 31 ("Neither the mortgage companies nor the home buyers were eligible for unsecured credit. It must follow that the primary security for

collateral consisted of a first lien deed of trust originated by the mortgage company, together with the home buyer's promissory notes that were endorsed in blank." CP at 28.

Furthermore, the record shows that after a mortgage company defaulted on its line of credit, Security resorted to the underlying loans. Consequently, the Board found that "[Security]'s only recourse, in the case of the mortgage company's failure to pay, was to the underlying real property liens pledged to secure the lines of credit." CP at 31.

> (3) Were the loans secured by personal property or real property?

The Department next challenges finding 36[14] and the first sentence of finding 35.[15] It argues that these findings are unsupported by substantial evidence and contradict some of the Board's other findings. It claims that several of the Board's findings establish that Security's loans to mortgage companies were secured by the loans the mortgage companies assigned, not by real property.

To support its argument, the Department notes that when a mortgage company defaulted, Security did not foreclose against the real property, but instead it sold the mortgage loans on the secondary market. This argument is unpersuasive.

First, the Department's argument ignores the effect of the assignments. Second, substantial evidence supported the challenged findings. The record revealed that Security would not have extended credit to the mortgage companies without the assignments of the mortgage loans. In addition,

---

[Security]'s loans to mortgage companies were the assigned underlying deeds of trust."); *see also* RP at 95 (Security never extended credit to a mortgage company on an unsecured basis); RP at 143 (Without the assignments, it would have been "too risky" for Security to loan money to the "thinly capitalized" mortgage companies).

[14] Finding 36 provides: "The loans by [Security] to the mortgage companies would not have been made without real property security. The only value [Security] had to look to if the credit went bad was the underlying real property, pledged to [Security] by assignment." CP at 31.

[15] Finding 35, in relevant part provides: "[Security's] only recourse, in the case of the mortgage company's failure to pay, was to the underlying real property liens pledged to secure the lines of credit." CP at 31.

as Security points out, the assignments placed it in the shoes of the mortgage companies as beneficiaries under the deeds of trust executed by the underlying mortgage borrowers.[16] Third, Security's action after default by a mortgage company is consistent with the Board's finding that the underlying real property comprised the only valuable security for the loans.

C. *Erroneous interpretation or application of the law*

■ The Department's final argument is that the Board erroneously interpreted RCW 82.04.4292 and erroneously applied it to the facts of this case. The Department claims that Security made loans secured only by promissory notes, i.e., personal property. Under RCW 34.05.570(3)(d), we review such questions of law de novo. *City of Redmond v. Cent. Puget Sound Growth Mgmt. Hearings Bd.*, 136 Wn.2d 38, 46, 959 P.2d 1091 (1998).

■ Again, the Department ignores the effect of assigning the trust deeds. The loans the mortgage companies made were primarily secured by first deeds of trust on nontransient residential properties and these loans were assigned to Security, thereby making Security eligible for the exemption. The mortgage companies assigned the loans to Security during the warehouse phase. (i.e., the period after the mortgage company assigned the loan to Security, but before the loan was sold on the secondary market).[17] Therefore, any interest Security earned on these loans

---

[16] *See* RP at 100 (Security received assignments of the loans the mortgage companies made to the mortgage borrowers); RP at 101 (the assignments of the loan are significant because Security received "the real estate and all the rights of the . . . real estate" and the power to foreclose if necessary); RP at 120-21 (Security received an assignment of deed of trust in connection with each loan assigned to it); RP at 157 (after receiving (1) the original note, endorsed in blank, (2) the assignment of deed of trust, (3) the original filed deed of trust, and (4) a collateral transmittal letter from the mortgage company, Security understood that it owned the loan); *see also* Ex. 1423-24 (representative assignment of deed of trust); Ex. 1426-27 (representative deed of trust); Ex. 1429 (representative trust receipt); Ex. 1431 (representative transmittal letter); Ex. 1512-1532 (representative credit agreement between Security and a mortgage company); Ex. 1545-1576 (representative promissory note).

[17] "Contract rights are assignable unless forbidden by statute or otherwise violative of public policy." *Old Nat'l Bank of Wash. v. Arneson*, 54 Wn. App. 717, 723, 776 P.2d 145, *review denied*, 113 Wn.2d 1019 (1989). "An assignee steps into

(during that time) is deductible under RCW 82.04.4292. The Board did not erroneously interpret or apply the law.

Affirmed.

ARMSTRONG, C.J., and HUNT, J., concur.

the shoes of the assignor, and has all of the rights of the assignor." *Estate of Jordan v. Hartford Accident & Indem. Co.,* 120 Wn.2d 490, 495, 844 P.2d 403 (1993).