FILED
COURT OF APPEALS
DIVISION II

2013 JUL -9 AM 9:08

STATE OF WASHINGTON

BY_____
DEPUTY

# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| CASHMERE VALLEY BANK, | No. 42514-9-II |
| Appellant, | |
| v. | |
| STATE OF WASHINGTON DEPARTMENT OF REVENUE, | PUBLISHED OPINION |
| Respondent. | |

PENOYAR, J. — The Washington State Department of Revenue (Department) audited Cashmere Valley Bank (Cashmere) for the years 2004 through 2007 and assessed additional business and occupation (B&O) tax for interest income Cashmere had received on investments in real estate mortgage investment conduits (REMICs) and collateralized mortgage obligations (CMOs).

Cashmere paid the additional tax and then filed a complaint for refund in superior court, claiming that the interest income was deductible under RCW 82.04.4292.[1] On summary judgment, the trial court denied Cashmere the deduction. Cashmere appeals, arguing that the interest income qualifies for the deduction as interest on investments primarily secured by first mortgages or trust deeds on nontransient residential property. Because Cashmere does not have any legal recourse to the mortgages and trust deeds underlying its investments, its investments are not primarily secured by them. Thus, we affirm.

---

[1] Unless noted otherwise, RCW 82.04.4292 refers to the 1980 version of the statute, which was in force during the audit period. The legislature amended the statute in 2010 and 2012. *See* LAWS OF 2010, 1st Spec. Sess., ch. 23, § 301; LAWS OF 2012, 2d Spec. Sess., ch. 6, § 102.

FACTS

I.  FACTUAL BACKGROUND

Cashmere operates 11 branch banks in several central Washington cities, a loan production office in Yakima, and a municipal banking office in Bellevue. Cashmere's business includes personal and business banking and mortgage, insurance, investment, and leasing services.

In 2009, the Department audited Cashmere for the period January 1, 2004, through December 31, 2007. As a result of the audit, the Department assessed Cashmere for $346,178, including interest, in unpaid tax. Cashmere paid this amount in full on June 4, 2009. A large part of this tax assessment was B&O tax on interest income Cashmere received from investments in REMICs and CMOs.[2]

II. PROCEDURAL BACKGROUND

In July 2009, Cashmere filed a notice of appeal and complaint for refund in superior court, claiming that the interest income Cashmere received from the REMICs and CMOs was deductible under RCW 82.04.4292. Cashmere sought summary judgment on this issue. The trial court denied Cashmere's motion and ruled for the Department. Cashmere timely appeals.

ANALYSIS

Cashmere challenges the denial of an interest income deduction under RCW 82.04.4292 for income derived from REMIC and CMO investments. Under RCW 82.04.4292, interest income a bank receives from investments primarily secured by first mortgages or trust deeds on nontransient residential properties is deductible from its B&O tax calculations. A bank's

---

[2] During the audit period, Cashmere received a net amount of $17,837,861 in interest income from investments in REMICs and CMOs. The Department assessed $267,568 in B&O tax on this amount.

2

qualifying "secured" investment must be backed by collateral and the bank must have some recourse against that collateral.

REMICs and CMOs are investment instruments of pooled mortgage loans that have been broken down into the individual principal payments and interest payments associated with each mortgage. The issuer repackages the principal and interest payments according to their payout and risk characteristics into "tranches" or slices of the mortgage pool. A bank invests in REMICs and CMOs by purchasing bonds that correspond to the different classes that the various tranches represent and that have stated payment terms.

If a payment default occurs on a bond, the bank's recourse is against the issuer and, to some extent, the class collateral or tranche for the bond. But the bank has no recourse against the original mortgages or trust deeds underlying the tranches—the bank cannot, for example, foreclose any of those mortgages. The bank's investments are not secured by these mortgages or trust deeds. Accordingly, Cashmere's investments in REMICs and CMOs are not primarily secured by first mortgages or deeds of trust, and Cashmere cannot take the deduction for interest income received from these investments.

I.    STANDARD OF REVIEW

We review summary judgment de novo. *American Best Food, Inc. v. Alea London, Ltd.*, 168 Wn.2d 398, 404, 229 P.3d 693 (2010). We also review statutory interpretation, which is a question of law, de novo. *HomeStreet, Inc. v. Dep't of Revenue*, 166 Wn.2d 444, 451, 210 P.3d 297 (2009).

II.   THE B&O TAX DEDUCTION

Washington State imposes a B&O tax on a business's gross income "for the act or privilege of engaging in business activities." RCW 82.04.220(1). A business may be able to

3

deduct certain income from its gross income when calculating its B&O tax, but the business has the burden of showing that it qualifies for those deductions it claims. *See HomeStreet*, 166 Wn.2d at 455. Importantly, courts construe statutes granting tax deductions strictly, but fairly, against the taxpayer. *Activate, Inc. v. Dep't of Revenue*, 150 Wn. App. 807, 813, 209 P.3d 524 (2009).

The B&O tax deduction at issue is found at RCW 82.04.4292: "In computing tax there may be deducted from the measure of tax by those engaged in banking, loan, security or other financial businesses, amounts derived from interest received on investments or loans primarily secured by first mortgages or trust deeds on nontransient residential properties."

In *HomeStreet*, our Supreme Court analyzed this deduction as having five essential elements:

1. The person is engaged in banking, loan, security, or other financial business;
2. The amount deducted was derived from interest received;
3. The amount deducted was received because of a loan or investment;
4. The loan or investment is primarily secured by a first mortgage or deed of trust; and
5. The first mortgage or deed of trust is on nontransient residential real property.

166 Wn.2d at 449. In that case, HomeStreet had originated mortgage loans that it then sold to secondary market lenders like the Federal National Mortgage Association (Fannie Mae), the Government National Mortgage Association (Ginnie Mae), and the Federal Home Loan Mortgage Corporation (Freddie Mac). HomeStreet, 166 Wn.2d at 447-48. Some of these loans HomeStreet sold in their entirety, but some loans HomeStreet sold only in part, retaining rights to service the loans and receive a portion of the interest due on the loans as servicing fees. *HomeStreet*, 166 Wn.2d at 447-48.

The court underscored in *HomeStreet* that the only element of RCW 82.04.4292 in question was the second—whether the servicing fees HomeStreet received on the loans it partially retained were derived from interest received. 166 Wn.2d at 449. The court held that these fees were derived from interest and that HomeStreet was therefore entitled to deduct them from its B&O tax. *HomeStreet*, 166 Wn.2d at 455-56.

But the second element is not in question here. As Cashmere correctly points out, the only element in question here is the fourth—whether the investments Cashmere made in REMICs and CMOs were primarily secured by first mortgages or deeds of trust.[3] This inquiry requires understanding the nature of mortgage-backed securities generally, and REMICs and CMOs specifically as a type of mortgage-backed security.

## III.    MORTGAGE-BACKED SECURITIES

Understanding REMICs and CMOs requires a basic understanding of how mortgages[4] are converted into different kinds of mortgage-backed securities. This process begins when a person borrows money from a lender—like a bank or mortgage lender—to purchase a home. As security for this loan, the borrower gives the lender a mortgage on the home. If the borrower fails to pay the loan's principal and interest on the terms to which the borrower and lender agreed, the lender may foreclose on the home and sell it to recover the money it lent to the borrower.

---

[3] The first three elements are not in dispute, nor is the fifth. With respect to the fifth element, the mortgages or deeds of trusts underlying Cashmere's investments in REMICs and CMOs at issue here were in fact on non-transient residential real property.

[4] For purposes of this explanation, "mortgages" entails both mortgages and deeds of trust.

The lender, however, will not always retain the mortgage. Often, the lender will sell the mortgage to a buyer on the secondary market. This buyer, usually a large private firm or government-affiliated agency, acquires the right to receive the borrower's principal and interest payments on the home loan, and also the right to foreclose on the home if the borrower does not timely make those payments.[5]

A secondary-market buyer "securitizes" the mortgages it purchases from various lenders by first pooling the mortgages and then issuing interests based on those pools to investors. These interests—that is, these mortgaged-backed securities—vary, however, with respect to how they are structured and what kind of interest the investors receive.

Two types of mortgage-backed securities are mortgage participation certificates and mortgage pass-through securities. Mortgage participation certificates appeared early in the history of mortgage-backed securities. The certificate consists of one party selling a pool of whole loans to another party. The seller warrants that it will repurchase any loan in the pool that does not conform to its representations and warranties. The buyer fully owns the loans, however, and has recourse only against the original borrower for losses on conforming loans. Investors' desires for greater security led to the development of mortgage pass-through securities.

Mortgage pass-through securities are a form of mortgage-backed securities represented by share certificates that grant the certificate holder a proportionate ownership interest in a pool of mortgages held in trust. The certificate holder receives cash flow from the underlying mortgages as borrowers make their principal and interest payments to the holding trust—that is,

---

[5] The borrower, however, may not be aware that the lender sold the mortgage—the lender may have contracted with the buyer to continue servicing the mortgage vis-à-vis the borrower. The lender, then, may be receiving the borrower's payments and passing them along to the buyer for a fee. Or, in the event of the borrower's default, the lender may foreclose on the property and pass along the proceeds of the foreclosure sale, less the lender's fee or share, to the buyer.

the trust passes the proportionate interest in the underlying payments to the certificate holder. The return an investor in this security receives thus mirrors the payments borrowers make on the mortgages in the pool.

Under both participation certificates and pass-through securities, the investor owns a share of the borrowers' mortgage obligations and receives whatever payments the borrowers make. The Department has concluded that such mortgage-backed securities are primarily secured by first mortgages or trust deeds because "[d]efault by any borrower in the repayment of an underlying loan will give the security holder [the investor] the rights to the proceeds of sale of the property in foreclosure." Clerk's Papers (CP) at 877 (quoting Wash. Dep't of Revenue, Determination No. 90-288, 10 Wash. Tax Dec. 314, 317 (1990)). The first mortgages or trust deeds remain the first level of recourse for investors in such securities even if the issuer of the securities has given a guaranty of repayment because "guarantors are only secondarily liable in the event foreclosure proceeds are insufficient to repay the defaulted loans." CP at 877 (quoting Revenue Determination No. 90-288, 10 Wash. Tax Dec. at 317).[6]

REMICs and CMOs[7] represent a further step in this process of mortgage securitization, but remove investor rights in the underlying mortgages. With mortgage participation certificates and mortgage pass-through securities, the mortgages underlying these securities remain largely intact; any division of interest between parties is accomplished through warranties on or

---

[6] Cashmere alleges that if we hold that investments in REMICs and CMOs do not qualify for the deduction, we will have effectively read "investments" out of RCW 82.04.4292. While we do not address in this opinion whether the Department's above-cited ruling allowing the deduction for mortgage-backed securities like participation certificates and pass-through securities is correct, even if investments in such mortgage-backed securities may qualify for the deduction, Cashmere's argument here under different circumstances fails.

[7] In essence, REMICs and CMOs are the same type of investment instrument; REMICs are more recent, as they enjoy certain federal tax benefits.

7

proportionate ownership of those whole loans. In contrast, the mortgages in the pools underlying REMICs and CMOs[8] are divided into the individual principal payments and interest payments due under each mortgage.[9] The issuer of the REMIC or CMO then reconfigures these payments into new combinations of principal and interest called "tranches." Each tranche, or class, represents a new security that can be traded separately on the secondary market. Investors purchase fractional shares in the different classes. But rather than representing a proportionate ownership in pools of mortgages,[10] these fractional shares take the form of different classes of bonds issued against and corresponding to the reconfigured mortgage payments that constitute each tranche of the REMIC or CMO.[11]

IV.    INVESTMENTS "PRIMARILY SECURED" BY FIRST MORTGAGES OR TRUST DEEDS

Cashmere asserts that the interest income it received during the audit period from its investments in REMICs and CMOs should be deductible from its B&O tax because these

---

[8] The assets underlying REMICs and CMOs can be whole mortgage loans or, to make matters even more complicated, other mortgage-backed securities.

[9] For example, a 30-year fixed-rate mortgage requiring monthly principal and interest payments would consist of 720 individual payments—360 principal payments and 360 interest payments. A pool with 1,000 of these kinds of mortgages would thus have 720,000 separate payments of principal and interest.

[10] Issuers may designate investments in REMIC classes as representing beneficial ownership interests in the trust holding the underlying mortgages. But such a designation does not change the nature of investments in REMICs and CMOs as essentially interests in bonds (debt), not ownership (equity); the issuer is still the owner of the respective mortgage notes. See, e.g., CP at 845 ("Fannie Mae is at all times the owner of the mortgage note, whether the note is in our portfolio or whether we own it as trustee for [a mortgage-backed security] trust.").

[11] To illustrate, consider a theoretical REMIC with four tranches: A, B, C, and Z. Each tranche represents a different level of risk and a different payout period. If an investor, based on its investment preferences, purchased Z-class bonds, those bonds would be issued against tranche Z, which would comprise those reconfigured mortgage payments that corresponded to the risk and return associated with investment in the Z tranche. Tranche Z, for example, could comprise the principal and interest payments due in the last five years of the mortgages involved.

investments were, in the plain language of RCW 82.04.4292, "primarily secured by first mortgages or trust deeds." To support this position, Cashmere points out that the mortgages underlying these investment instruments were primarily secured by first mortgages or deeds of trust and that the interest income Cashmere received was traceable to the interest payments borrowers made on these mortgages. Cashmere's observations are correct, but the conclusion it reaches from those observations is not—Cashmere incorrectly conflates the mortgages underlying its investments with the investments themselves. Equating investments with the mortgages underlying them may work for some mortgage-backed securities for purposes of taking the deduction at issue here, but not for REMICs and CMOs.

Whereas the mortgages underlying investments in REMICs and CMOs may in some economic sense serve to secure those investments, from a legal standpoint the investor in REMICs and CMOs has no recourse to those underlying mortgages as security for the investment. To the extent investments in REMICs and CMOs are secured in a legal sense by any collateral, that collateral is the tranches or classes that an issuer can separately trade as securities in fulfillment of its financial obligations to an investor.

To analyze Cashmere's claim, we must first return to the statutory language granting the deduction: "In computing tax there may be deducted from the measure of tax by those engaged in banking, loan, security or other financial businesses, amounts derived from interest received on investments or loans primarily secured by first mortgages or trust deeds on nontransient residential properties." RCW 82.04.4292. Again, the only issue here is whether the income for which Cashmere is claiming the deduction consisted of "amounts derived from interest received on investments or loans primarily secured by first mortgages or trust deeds."

In addressing this issue, we first look to the statute's plain language. *HomeStreet*, 166 Wn.2d at 451. If the statute is subject to multiple reasonable interpretations, it is ambiguous. *HomeStreet*, 166 Wn.2d at 452. And if the statute is ambiguous, we may resort to statutory construction, which includes considering statutory context and legislative history, to resolve the ambiguity. *Dep't of Revenue v. Bi-Mor, Inc.*, 171 Wn. App. 197, 203, 286 P.3d 417 (2012), *review denied*, 177 Wn.2d 1002 (2013)); *Wells Fargo Bank, N.A. v. Dep't of Revenue*, 166 Wn. App. 342, 350-51, 271 P.3d 268, *review denied*, 175 Wn.2d 1009 (2012).

The first question is whether the "investments or loans" the statute mentions refer to transactions entered into by the taxpayer, or to investments or loans to which the taxpayer might not have been a party but from which the taxpayer has derived earnings from interest. At oral argument, Cashmere affirmed its position that an amount earned on any transaction is deductible under RCW 82.04.4292 if the amount's origin can be traced back to interest payments on residential home loans. Thus, amounts earned on an investment in the last car of a long "tranche train" of reconfigured and resold interests is deductible if the engine driving the train is homeowners' interest payments on their respective home loans. The Department maintains that the deduction is available only to taxpayers who have an ownership interest in the investments or loans themselves.

The legislature's use of the phrase "amounts derived from interest" instead of just the word "interest" appears to favor Cashmere's tranche-train argument. The phrase implies that earnings that flow to a taxpayer from interest on investments or loans are deductible even if the taxpayer was not a party to the investment or loan transactions. Because we cannot interpret the

phrase "amounts derived from" right out of the statute,[12] this phrase would appear to allow us to interpret "investments or loans" as referring to those in which the taxpayer may not have been involved as a party and, consequently, in which the taxpayer may not have acquired any ownership interest.

While we acknowledge that the above interpretation of "investments or loans" is a reasonable one, the statute's language alone allows for another reasonable interpretation of "investments or loans" as referring rather to transactions into which the taxpayer itself has entered. Because these two reasonable interpretations render the statute ambiguous, we look beyond the statute's language and note that chapter 82.04 RCW is tax code that not only assesses tax on certain business activities but also guides a business in knowing which of its activities are taxable and which are deductible. In this context, RCW 82.04.4292 would appear to speak directly to Cashmere—the taxpayer—and its activities, namely, the investment or loan transactions into which it has entered and from which it is generating earnings from interest income.

---

[12] We are to give each word in a statute meaning and significance. *HomeStreet*, 166 Wn.2d at 452.

11

We are further persuaded that this second interpretation is the right one because the legislature removed the phrase "amounts derived from" from RCW 82.04.4292 in 2010.[13] LAWS OF 2010, 1st Spec. Sess., ch. 23, § 301. Removing this phrase indicates to us that the legislature intends "investments or loans" to refer to the taxpayer's investments or loans, and not to investments or loans from which a taxpayer farther down the tranche train is deriving earnings sourced from interest payments. Especially taken in light of the judicial precedent of construing statutes granting tax deductions strictly but fairly against the taxpayer, this statutory context and legislative history lead us to conclude that "investments or loans" refer to those entered into by the taxpayer.

Because "investments or loans" in RCW 82.04.4292 refer to Cashmere's own investments in REMICs and CMOs, Cashmere cannot, in taking the deduction, rely on the nature of the original home loans that underlie its investments as being "primarily secured" by first mortgages or trust deeds. Instead, Cashmere, if it is to take the deduction, must show that its investments are themselves "primarily secured" by first mortgages or trust deeds. Analyzing whether these investments are secured in this way first requires an understanding of what "secured" means here.

---

[13] This amendment followed the Supreme Court's ruling in *HomeStreet*. In that case, a bank partially sold mortgage loans it had originated to secondary-market buyers, but retained rights to service the loans; as a servicing fee, the bank kept a portion of the interest payments borrowers made on their loans. 166 Wn.2d at 448. In determining whether the bank was entitled to the deduction at RCW 82.04.4292, the court analyzed the phrase "amounts derived from interest," concluding that it permitted the bank to take the deduction because "[t]he revenue at issue here is received from a source, and the source is interest. The revenue is therefore 'derived from interest' because it is taken from the interest the borrowers pay on their loans." 166 Wn.2d at 454. The court further concluded that "[u]nder the statute it is not essential to determine why the money is received or taken from a source." 166 Wn.2d at 454.

12

The statute does not define "secured," and neither party offers a definition of the term. We note, however, that "secured" is a familiar legal term, and "[a] familiar legal term used in a statute is given its familiar legal meaning." *Rasor v. Retail Credit Co.*, 87 Wn.2d 516, 530, 554 P.2d 1041 (1976). When referring to a debt or obligation, as is the case here, "secured" means "supported or backed by security or collateral." BLACK'S LAW DICTIONARY 1475 (9th ed. 2009). "Security," in turn, means "[c]ollateral given or pledged to guarantee the fulfillment of an obligation." BLACK'S LAW DICTIONARY 1475 (9th ed. 2009). A party with a "secured" investment is therefore a "secured" party "protected by a pledge, mortgage, or other encumbrance of property that helps ensure financial soundness and confidence" with respect to the party's investment. BLACK'S LAW DICTIONARY 1475 (9th ed. 2009). Thus a "secured" party necessarily has some recourse to collateral securing its investment. In the context of real estate transactions, a secured party has the right, for example, to foreclose on the collateral (such as with a mortgage or real estate contract) or to require another to foreclose for them (such as with a deed of trust) if payment obligations are not met.

We accept that homeowners' payments on their mortgages and trust deeds are the source of the REMIC and CMO trustees' payments to Cashmere for the bonds it has purchased. And we acknowledge that in an overall economic sense the homeowners' payments may be considered the primary underlying security for the return Cashmere receives on its investments. But our analysis and review are legal, not economic. From this legal position, Cashmere's investments—and Cashmere itself—are not secured at all, much less primarily secured, by the mortgages and trust deeds underlying those investments because Cashmere has no recourse against those mortgages and trust deeds. Cashmere has no right to proceed directly against homeowners who fail to make payments under the mortgages or trust deeds. And Cashmere

does not have a right to require the respective trustees of its investments to proceed against homeowners to satisfy the trustees' financial obligations to Cashmere.

Cashmere has rights against the trustees that issued bonds to Cashmere, but these rights do not extend to actions on the underlying mortgages or trust deeds. In the event of a trustee's default (perhaps because of homeowners' defaults under their mortgages or trust deeds), Cashmere may be able to replace the trustee, but the successor trustee still takes legal title to the underlying mortgages and trust deeds. And, as the Department observed in a 1990 ruling, Cashmere may have the right to require a trustee to sell tranches or classes to satisfy its obligation to Cashmere, but Cashmere does not have the right to require the sale of the underlying mortgages or trust deeds:

> [T]he bond issuer secures its obligation by pledging readily tradeable securities in trust for the benefit of the bondholder. Upon default of the bonds, the bondholder's sole right is to require the trustee to sell the mortgage-backed security itself. The occurrence of an event of default under the terms of the trust indenture does not give the bond holder rights of foreclosure against the property securing the mortgage-backed security.

CP at 878 (quoting Revenue Determination No. 90-288, 10 Wash. Tax Dec. at 318.)

If Cashmere's investments in REMICs and CMOs were primarily secured by any collateral, that collateral would be the separately traded mortgage-backed securities represented by tranches or classes. But to simply argue that Cashmere's ultimate source of return—the underlying mortgages and trust deeds—is its primary source of security ignores the fact that Cashmere has no recourse to that ultimate source of payments. Because Cashmere does not have such recourse, Cashmere cannot show that its investments were primarily secured by first mortgages or trust deeds, and thus Cashmere cannot take the deduction.

14

42514-9-II

We affirm.

_____
Penoyar, J.

We concur:

_____
Van Deren, J.P.T.

_____
Worswick, C.J.

15